38                         464 Mass. 38 (2013)

Zoning Board of Appeals of Lunenburg *v.* Housing Appeals Committee.

## ZONING BOARD OF APPEALS OF LUNENBURG *VS.* HOUSING APPEALS COMMITTEE & another.[1]

Worcester. September 5, 2012. - January 8, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Housing. Zoning,* Housing appeals committee, Low and moderate income housing, Comprehensive permit.

Discussion of the history, purpose, and operation of the Massachusetts Comprehensive Permit Act, G. L. c. 40B, §§ 20-23, and discussion of the legal standard applied by a court when reviewing a decision of the housing appeals committee. [39-44]

A Superior Court judge properly upheld a decision of the housing appeals committee (HAC) directing a town's zoning board of appeals to issue a comprehensive permit to a developer seeking to build 146 condominium units in attached townhouses, where the HAC did not err in excluding housing that was not subsidized by the Federal or State government (i.e., affordable, market-rate, unsubsidized housing in the town) in weighing the regional need for affordable housing [44-48]; where substantial evidence supported the HAC's findings and conclusion that the proposed project was not inconsistent with the town's master planning and would not undermine those plans [48-52]; and where the HAC did not abuse its discretion in concluding that the balance of interests in the circumstances favored the regional need for affordable housing rather than the local concern of a zoning nonconformity [52-55].

CIVIL ACTION commenced in the Superior Court Department on January 4, 2010.

The case was heard by *John S. McCann,* J., on a motion for judgment on the pleadings.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Daniel C. Hill* for the plaintiff.

*Annapurna Balakrishna,* Assistant Attorney General, for housing appeals committee.

*Nicholas C. Cramb* for Hollis Hills, LLC.

*J. Raymond Miyares, Christopher H. Heep, Jonathan D. Wit-*

[1]Hollis Hills, LLC (Hollis Hills).

*ten, & Barbara Huggins,* for town of Hopkinton & others, amici curiae, submitted a brief.

*Jeffrey W. Sacks, Kurt M. Mullen, & Troy K. Lieberman,* for Citizens' Housing and Planning Association, amicus curiae, submitted a brief.

GANTS, J. Hollis Hills, LLC (Hollis Hills), filed an application for a comprehensive permit with the zoning board of appeals of Lunenburg (board) under G. L. c. 40B, §§ 20-23, to build 146 condominium units in attached townhouses (project). The board denied the application, and Hollis Hills appealed the denial to the Massachusetts housing appeals committee (HAC) of the Department of Housing and Community Development, which set aside the board's decision and directed the board to issue a comprehensive permit.[2] The board appealed, under G. L. c. 30A, § 14, to the Superior Court, which affirmed the HAC's decision. We transferred the board's appeal to this court on our own motion.

On appeal, the board claims that the HAC made four errors. First, it claims that the HAC erred in concluding that the availability of affordable, market-rate homes in the town of Lunenburg (town) should not be considered in determining the regional need for low and moderate income housing. Second, it argues that the HAC's finding that the board's local concerns, specifically the project's alleged incompatibility with the town's master plans, did not outweigh the regional need for low and moderate income housing was not supported by substantial evidence. Third, the board contends that the HAC erred in failing to recognize that, under the doctrine of "infectious invalidity," Hollis Hills did not have the requisite site control over a parcel of land in the project where a necessary sewer connection would be located and that the HAC could not waive infectious invalidity because it is matter of State law, not a local concern. Fourth, the board claims that the HAC erred in not staying the proceedings until the Governor had appointed a fifth member to the HAC. We address each claim in turn and affirm the judgment of the Superior Court affirming the HAC's decision.[3]

*Legal background and standard of review.* Before addressing

---

[2]The housing appeals committee (HAC) of the Department of Housing and Community Development made the comprehensive permit subject to four conditions, none of which is relevant to this appeal.

[3]We acknowledge the amicus brief of the towns of Hopkinton, Boxborough,

the particular legal and factual issues before us in this case, we describe briefly the history, purpose, and operation of the Massachusetts Comprehensive Permit Act, sometimes referred to as the "anti-snob" zoning act, G. L. c. 40B, §§ 20-23 (act). *Zoning Bd. of Appeals of Wellesley* v. *Ardemore Apartments Ltd. Partnership*, 436 Mass. 811, 814 (2002) (*Wellesley II*). "We have long recognized that the Legislature's intent in enacting [the act] is 'to provide relief from exclusionary zoning practices which prevented the construction of badly needed low and moderate income housing' in the Commonwealth." *Standerwick* v. *Zoning Bd. of Appeals of Andover*, 447 Mass. 20, 28-29 (2006), quoting *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 354 (1973). "The structure of the act itself reflects a 'careful balance between leaving to local authorities their well-recognized autonomy generally to establish local zoning requirements . . . while foreclosing municipalities from obstructing the building of a minimum level of housing affordable to persons of low income.' " *Zoning Bd. of Appeals of Amesbury* v. *Housing Appeals Comm.*, 457 Mass. 748, 763-764 (2010), quoting *Board of Appeals of Woburn* v. *Housing Appeals Comm.*, 451 Mass. 581, 584 (2008).

The act allows a public agency, or a limited dividend or nonprofit organization, that wishes to construct low or moderate income housing "to circumvent the often arduous process of applying to multiple local boards for individual permits and, instead, to apply to the local board of appeals for issuance of a single comprehensive permit." *Board of Appeals of Woburn* v. *Housing Appeals Comm.*, supra at 583, quoting *Middleborough* v. *Housing Appeals Comm.*, 449 Mass. 514, 516 (2007). See G. L. c. 40B, § 21 (organization "may submit to the board of appeals . . . a single application to build such housing in lieu of separate applications to the applicable local boards"). The zoning board has "the same power to issue permits or approvals as any local board or official who would otherwise act with respect to such application." *Id.*

"If the board denies an application for a comprehensive permit, the developer may appeal to HAC." *Zoning Bd. of Appeals*

Norton, Townsend, and Tyngsborough; and the amicus brief of the Citizens' Housing and Planning Association.

*of Wellesley* v. *Housing Appeals Comm.*, 385 Mass. 651, 656 (1982) (*Wellesley I*), citing G. L. c. 40B, § 22. When the HAC reviews the decision of a local zoning board of appeals to deny a comprehensive permit, "[t]he hearing . . . shall be limited to the issue of whether . . . the decision of the board of appeals was reasonable and consistent with local needs." G. L. c. 40B, § 23.[4] See 760 Code Mass. Regs. § 56.07(1)(b) (2008) ("In the case of the denial of a Comprehensive Permit, the issue shall be whether the decision of the Board was Consistent with Local Needs").

"Consistent with local needs" is a term of art under G. L. c. 40B, § 20, defined as follows:

> "[R]equirements and regulations shall be considered consistent with local needs if they are reasonable in view of the regional need for low and moderate income housing considered with the number of low income persons in the city or town affected and the need to protect the health or safety of the occupants of the proposed housing or of the residents of the city or town, to promote better site and building design in relation to the surroundings, or to pre-serve open spaces, and if such requirements and regula-tions are applied as equally as possible to both subsidized and unsubsidized housing."

The statute further provides that such requirements and regula-tions "shall be consistent with local needs . . . where . . . low or moderate income housing exists which is in excess of ten per cent of the housing units reported in the latest federal decennial census of the city or town or on sites comprising one and one half per cent or more of the total land area zoned for residential, commercial or industrial use." *Id.*

Under the regulations issued by the Department of Housing and Community Development (department) to administer the act, there is an "irrebuttable presumption" that a board's decision to deny an application for a comprehensive permit is "consistent with local needs" where the board determines that one or more

---

[4]"[T]he term 'reasonable' is surplus verbiage which does not add any substance to the 'consistent with local needs' standard." *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 366 n.17 (1973).

of the grounds set forth in 760 Code Mass. Regs. § 56.03(1) (2008) has been satisfied. 760 Code Mass. Regs. § 56.07(3)(a) (2008). See 760 Code Mass. Regs. § 56.07(2)(b)(1) (2008). One of these grounds is that the town's subsidized housing inventory (SHI) exceeds ten per cent of the town's total housing units. 760 Code Mass. Regs. § 56.03(3)(a) (2008). Where this or any of the other grounds in 760 Code Mass. Regs. § 56.03(1) is established, the "HAC is without authority to order that board to grant a comprehensive permit or to modify or remove conditions," and the board's denial of an application must be affirmed. *Taylor* v. *Housing Appeals Comm.*, 451 Mass. 149, 151-152 (2008) ("if a municipality has reached the ten per cent threshold, and its zoning board of appeals denies a developer's application, then the application process is effectively terminated"). 760 Code Mass. Regs. § 56.07(3)(a). Here, the parties have stipulated that the town has not proved any of these grounds.[5]

Where, as here, none of the grounds that would trigger a conclusive presumption is present, the regulations and our cases provide that there is "a rebuttable presumption that there is a substantial Housing Need which outweighs Local Concerns." *Id.* See *Boothroyd* v. *Zoning Bd. of Appeals of Amherst*, 449 Mass. 333, 340 (2007), quoting *Board of Appeals of Hanover* v. *Housing Appeals Comm., supra* at 367 ("municipality's failure to meet its minimum [affordable] housing obligations, as defined in § 20, will provide compelling evidence that the regional need for housing does in fact outweigh the objections to the proposal"). Where a town attempts to rebut this presumption, the board bears "the burden of proving, first, that there is a valid health, safety, environmental, design, open space, or other Local Concern which supports such denial, and then, that such Local Concern outweighs the Housing Need." 760 Code Mass. Regs. § 56.07(2)(b)(2) (2008). See *Board of Appeals of Hanover* v. *Housing Appeals Comm., supra* ("In cases where the locality has not met its minimum housing obligations, the board must rest its decision on whether the required need for low and moderate income housing outweighs the valid planning objec-

---

[5]Only 1.9 per cent of Lunenburg's housing units are included in its subsidized housing inventory.

tions to the details of the proposal such as health, site design, and open spaces").[6]

Under the act, the HAC's decision may be reviewed in the Superior Court under G. L. c. 30A, which in turn provides that the court may set aside the decision of the agency "if it determines that the substantial rights of any party may have been prejudiced because the agency decision is . . . [u]nsupported by substantial evidence; or . . . otherwise not in accordance with law." G. L. c. 30A, § 14 (7). See *Wellesley I, supra* at 657 ("decision of HAC must be upheld if it is supported by substantial evidence," which is "such evidence as a reasonable mind might accept as adequate to support a conclusion"). In this analysis, we give "due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it," G. L. c. 30A, § 14 (7), and we "apply all rational presumptions in favor of the validity of the administrative action." *Middleborough* v. *Housing Appeals Comm.*, 449 Mass 514, 524 (2007), quoting *Wellesley I, supra* at 654. "A court may not displace an administrative board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Wellesley I, supra* at 657, quot-

---

[6]The regulations provide guidance as to how these considerations should be weighed in the balance:

"1. the weight of the Housing Need will be commensurate with the regional need for Low or Moderate Income Housing, considered with the proportion of the municipality's population that consists of Low Income Persons;

"2. the weight of the Local Concern will be commensurate with the degree to which the health and safety of occupants or municipal residents is imperiled, the degree to which the natural environment is endangered, the degree to which the design of the site and the proposed housing is seriously deficient, the degree to which additional Open Spaces are critically needed in the municipality, and the degree to which the Local Requirements and Regulations bear a direct and substantial relationship to the protection of such Local Concerns; and

"3. a stronger showing shall be required on the Local Concern side of the balance where the Housing Need is relatively great."

760 Code Mass. Regs. § 56.07(3)(b) (2008).

ing *Labor Relations Comm'n* v. *University Hosp., Inc.*, 359 Mass. 516, 521 (1971).

*Discussion.* 1. *Calculating the regional need for low and moderate income housing.* The board contends that the HAC erred in failing to consider the availability of low-cost, market-rate, unsubsidized housing in the town in weighing the housing need. The town points to testimony from its expert, Douglas Ling, that most c. 40B homeownership programs define low or moderate income housing as that which is affordable to house-holds earning no more than eighty per cent of area median income. Based on United States Department of Housing and Urban Development statistics, Ling determined that, within the Lunenburg region, the maximum affordable sales prices for a household earning seventy and eighty per cent of area median income were $140,000 and $160,000, respectively. Ling reported that 11.5 per cent of the homes sold in the town in 2006 and 2007 were purchased for $160,000 or less, and that 8.2 per cent of the homes were purchased at prices at or below $140,000. Ling also analyzed home sales in a seven-community region, which included Lunenburg, and testified that 7.6 per cent of homes in the region were included in the SHI, 14.6 per cent of homes sold for $160,000 or less, and 8.8 per cent of homes sold for $140,000 or less.[7] Ling also opined that demand for "Chapter 40B housing" in the town was weak in 2007 because housing priced under $160,000, "when sold on the open market and listed commercially, typically stayed on the market for over six months." We conclude that the HAC did not err in excluding housing that is not "subsidized by the federal or state government" in weighing the regional need for affordable housing.

The board's argument fails because it conflicts with the plain meaning of the Act's language. Under G. L. c. 40B, § 20, "housing need" is effectively defined as "the regional need for low and moderate income housing considered with the number of low income persons in the city or town affected" because that is the factor that is to be considered in determining whether local requirements or regulations are "[c]onsistent with local needs." This definition is made explicit in the department's regulations,

[7]The region also included Ashby, Fitchburg, Lancaster, Leominster, Shirley, and Townsend.

where "[h]ousing [n]eed" is defined using almost the exact same language. 760 Code Mass. Regs. § 56.02 (2008).[8] The act defines "[l]ow or moderate income housing" to mean "any housing *subsidized by the federal or state government* under any program to assist the construction of low or moderate income housing as defined in the applicable federal or state statute, whether built or operated by any public agency or any nonprofit or limited dividend organization" (emphasis added). G. L. c. 40B, § 20. Therefore, the plain text of the act and the governing regulations requires the HAC, in weighing the housing need, to exclude from consideration any affordable housing that is not subsidized under a qualifying government-sponsored program. See *Wellesley I, supra* at 654.[9]

This interpretation is in harmony with the purpose of the act. It was originally drafted to address "an acute shortage of *decent, safe,* low and moderate cost housing throughout the commonwealth" (emphasis added). *Board of Appeals of Hanover* v. *Housing Appeals Comm., supra* at 351, quoting report of Committee on Urban Affairs (explaining 1967 House Doc. No. 5429). Some market-rate housing may be affordable because the units are neither decent nor safe. Other affordable market rate housing units may be both decent and safe, but may be affordable only temporarily because of a weak housing market. The HAC here found that "the inexpensive market rate housing in Lunenburg identified by the Board's witness included housing that was renovated and expanded, or torn down and replaced with more

---

[8]The only difference between the statutory and regulatory definitions is that G. L. c. 40B, § 20, refers to the "number of low income persons in the *city or town* affected" (emphasis added), and the regulation refers to the "number of Low Income Persons in *a municipality* affected" (emphasis added). 760 Code Mass. Regs. § 56.02 (2008).

[9]Housing developed under a State or Federal subsidy program only addresses the relevant housing need if the program "assist[s] the construction of low or moderate income housing as defined in the applicable federal or state statute." G. L. c. 40B, § 20. If the applicable statute or regulation of the subsidizing agency does not define low or moderate income housing, the regulations of the Department of Housing and Community Development (department) provide that "it shall be defined as units of housing whose occupancy is restricted to" "a household of one or more persons whose maximum income does not exceed 80% of the area median income, adjusted for household size, or as otherwise established by the Department in the guidelines." 760 Code Mass. Regs. § 56.02.

expensive housing, as well as units that were simply substandard." Even where inexpensive market-rate housing is decent and safe, and not being renovated or demolished, there is no way to ensure as the housing market strengthens that sale prices will not rise to levels that would be unaffordable to low or moderate income households. Nor is there any way to ensure that affordable market-rate homes will be limited in availability to low or moderate income households.

In contrast, precisely because such housing is subsidized by a Federal or State government or agency under a program to assist the construction of affordable housing, see note 9, *supra*, housing that would address the "regional need for low and moderate income housing" under G. L. c. 40B, § 20, typically must satisfy minimum requirements designed to ensure the quality of the housing and the reasonableness of the sale and resale price.[10] Furthermore, unless the statute or regulation applying to the subsidizing agency in question provides otherwise, occupancy of subsidized affordable low or moderate income housing units under the department's comprehensive permit regulations is restricted to "[i]ncome [e]ligible [h]ouseholds," defined as households "whose maximum income does not exceed 80% of the area median income, adjusted for household size." 760 Code Mass. Regs. § 56.02. "Use [r]estriction[s]" are accomplished through deed restrictions or other legally binding instruments that run with the land. *Id.* They are recorded at the registry of deeds, and they limit occupancy "during the term of affordability" established in a construction subsidy agreement. *Id.* 760 Code Mass. Regs. § 56.05(13) (2008).[11] Also, in order to be included on the SHI, subsidized affordable housing units

---

[10]The project's eligibility letter issued to Hollis Hills by the Massachusetts Housing Finance Agency (MassHousing) required the affordable units to be governed by a deed rider that ensured the units remained affordable to future buyers for a minimum of thirty years. See MassHousing, Housing Starts Program Affordable Housing Restriction (Deed Rider) (2012). See also United States Department of Housing and Urban Development, Housing Choice Voucher Homeownership Program Guidebook 25-26 (units assisted under Federal homeownership voucher program must meet housing quality standards set out in 24 C.F.R. § 982.401 [2012] and must pass two home inspections).

[11]Furthermore, we note that where low or moderate income housing is built under a comprehensive permit obtained in accordance with G. L. c. 40B, §§ 20-23 (act), and "where a comprehensive permit itself does not specify for

must be sold under an "[a]ffirmative [f]air [m]arketing [p]lan" that provides for a lottery or other resident selection process and "effective outreach to protected groups underrepresented in the municipality." 760 Code Mass. Regs. § 56.02 (defining "Affirmative Fair Marketing Plan" and providing that "[i]t shall be the responsibility of the Subsidizing Agency to enforce compliance with provisions of 760 [Code Mass. Regs. §§] 56.00 and applicable Department guidelines relating to matters including Affirmative Fair Marketing Plans [and] Use Restrictions"); Department of Housing and Community Development Comprehensive Permit Guidelines § II.A.1 (2012) (comprehensive permit guidelines) ("affordable housing units shall be subject to an Affirmative Fair Marketing and Resident Selection Plan that, at a minimum, meets the requirements set out in the following Section III, Affirmative Fair Housing Marketing Plan").[12]

---

how long housing units must remain below market, the Act requires an owner to maintain the units as affordable for as long as the housing is not in compliance with local zoning requirements, regardless of the terms of any attendant construction subsidy agreements." *Zoning Bd. of Appeals of Wellesley* v. *Ardemore Apartments Ltd. Partnership*, 436 Mass. 811, 813 (2002). See 760 Code Mass. Regs. § 56.04(7) (2008) ("[f]ollowing the issuance of a Comprehensive Permit, the Subsidizing Agency shall issue its final written approval of the Project to the Applicant," and "[s]uch approval shall, at a minimum: . . . confirm that the proposed Use Restriction is in a form consistent with Department guidelines").

Additionally, under the Department of Housing and Community Development Comprehensive Permit Guidelines § II.A.1 (2012) (comprehensive permit guidelines), for housing to be included in the subsidized housing inventory (SHI):

"All Use Restrictions must meet the following minimum standards:

". . .

"[Applies] for a term . . . that shall be not less than 15 years for rehabilitated units and not less than 30 years for newly created units. . . .

"Effectively restricts occupancy of Low and Moderate Income Housing to Income Eligible Households. . . .

"Contains terms and conditions for the resale of a homeownership unit, including definition of the maximum permissible resale price, and for the subsequent rental of a rental unit, including definition of the maximum permissible rent."

[12]Although the comprehensive permit guidelines were not introduced in evidence before the HAC, they are directly relevant to understanding the

We agree with the HAC that:

> "Market-rate housing, by definition, fails to meet the sub-
> sidy, use restriction and affirmative fair marketing plan
> requirements. Moreover, it cannot provide uniformity and
> controls by a subsidizing agency or guarantee minimum
> standards of quality necessary for long-term afford-
> ability. . . . Without the use restriction, there is no
> guarantee that housing currently priced within the range
> targeted to income eligible families will be ultimately oc-
> cupied by them, or that it will remain affordable."

In light of these differences between subsidized affordable hous-
ing units and unsubsidized market-rate units, we also agree with
the HAC that "evidence of low cost market-rate housing cannot
be factored into the consideration of the regional need for af-
fordable housing."

There was substantial evidence to support the HAC's finding
that the existing subsidized housing in the region did not ade-
quately address the regional need for housing. Only 1.9 per cent
of the town's housing units and only 7.6 per cent of the "year
round housing units" in the seven-town region were counted in
the SHI.[13]

2. *Weighing the town's master planning.* The HAC recognized
that a town's long-term comprehensive planning efforts, "when

___

department's regulations, because subsidizing agencies have "the responsibil-
ity . . . to enforce compliance with provisions of 760 [Code Mass. Regs.
§§] 56.00 and applicable Department guidelines." 760 Code Mass. Regs.
§ 56.02.

[13]Although the HAC declined to consider market-rate housing in determin-
ing the housing need, it nonetheless found that, even if it were to consider
market-rate affordable housing, the regional need for low and moderate income
housing still outweighed the local concerns. This finding, too, was supported
by substantial evidence. The town's 2006 affordable housing plan stated that
low income persons are "hard-pressed" to afford housing in town and that it
is "difficult[] for families below the median to live in Lunenburg." Addition-
ally, in the two-year period surveyed by the board's expert, Douglas Ling,
only eighteen homes in the town sold at or below $160,000, only 5.2 per cent
of the housing units in the town were assessed below $160,000, and only 3.1
per cent of the housing units in the seven-town region were assessed below
$140,000. Although Ling's report states that ten per cent of housing units in
the seven-town region were valued at less than $160,000, the table that he
cites to support this conclusion indicates that only 5.2 per cent of homes in
the region were assessed below $160,000.

expressed in a bona fide, effective master plan or comprehensive plan," may be so substantial a local concern as to outweigh the regional need for affordable housing. The HAC conducted a two-part analysis in evaluating master planning as a local concern. First, it determined whether the master plan was a legitimate local concern by asking three questions, all of which had to be answered in the affirmative for the master plan to be weighed as a local concern: "(1) Is the plan bona fide? (Was it legitimately adopted, and, more importantly, does it continue to function as a viable planning tool in the town?); (2) Does the plan promote affordable housing? and (3) Has the plan been implemented in the area of the site?" After finding that the town's master plan met this test, the HAC turned to the second part of the analysis: the weight to be given to the master plan as a local concern. The HAC declared that two factors are particularly important in determining how much weight to give the master plan: first, whether the affordable housing plan aspect of the master plan "has actually shown results" in terms of the construction of affordable housing, and second, whether the proposed project is inconsistent with and would undermine the plan to a significant degree.

The board does not challenge this analytical framework. Instead, it argues that substantial evidence does not support the HAC's finding that the board failed to meet its burden of proving that the proposed project is inconsistent with the master plan and would undermine the town's master planning. To evaluate this claim of error, we must take a careful look at the town's master plan at the time Hollis Hills applied to the board for a comprehensive permit. See 760 Code Mass. Regs. § 56.02 (defining "[l]ocal [r]equirements and [r]egulations" as those "in effect on the date of the [p]roject's application to the [b]oard").

The town relied on three planning documents to support its argument that the project was inconsistent with local concerns: the April, 2002, Lunenburg, Massachusetts Updated Master Plan for the New Millennium (master plan), the affordable housing plan approved by the department, and the 1999 Lunenburg comprehensive wastewater facilities plan (sewer plan). The master plan contains a "Housing Element" with its primary goal "[t]o provide appropriate housing for Residents of the

Town of Lunenburg." It notes that the town is "vulnerable to applications under Chapter 40B" because, at the time, the town only had fifty-four units, representing approximately 1.37 per cent of the town's 3,950 units that qualified as affordable housing under the act.

The affordable housing plan became effective five days before Hollis Hills submitted its comprehensive permit application on February 13, 2006, with a goal "[t]o develop 22 affordable housing units each year over the next five year[s]." It identified four sites for the location of affordable housing units: Lunenburg Estates, the Tri-Town Drive-in Theater, the Electric Avenue Drive-in Theater, and the Old Primary School building. But when the HAC issued its decision on December 4, 2009, no affordable housing eligible for inclusion in the SHI had yet been built on any of these designated sites.[14]

The sewer plan prioritized three phases of sewer expansion. The phase I sewer expansion that was approved by the town included the town center and the southwest area of town; it originally did not include a sewer along Electric Avenue that could be tied into a sewer line on the proposed project. However, in 2002, the town decided to extend a sewer line up Electric Avenue to take advantage of a State-funded economic development grant for a reconstruction project on Electric Avenue, and the sewer plan was amended to add a 5,000-foot spur from Whalom Road up Electric Avenue, which included the installation of a connection plug directly opposite the proposed project's parcel on Electric Avenue.

In concluding that the project is not inconsistent with and

---

[14]Even though the developers of Lunenburg Estates had received a comprehensive permit from the board ten months before the town adopted its affordable housing plan, no units had yet been constructed on the site. For the Tri-Town Drive-in Theater site, the town approved a 204-unit residential rental development, twenty-five per cent of which were affordable rental units, and issued building permits in May, 2007, but at the time of the HAC decision, it was unclear whether the project would go forward due to a dispute between the Tri-Town developer and the town regarding sewer privilege fees, which the developer claimed made the project too costly to construct. In September, 2007, the town planning board approved the Electric Avenue Drive-in Theater site for use as a self-storage facility. Finally, even though the town owned the Old Primary School building, it did not request affordable housing proposals for the site until 2008. Two days before the HAC hearing, the town voted to accept a developer's proposal for elderly housing on the site.

would not undermine the town's master planning, the HAC found that the master plan had not set aside the area of the site for a particular purpose inconsistent with the project, and that the project adequately protects open space and wetlands on the site.[15] It also noted that the project abuts one of the sites identified in the affordable housing plan as appropriate for affordable housing — the Electric Avenue Drive-in Theater site that had been approved for use as a self-storage facility — and would bring affordable housing to an area of the town designated for such housing.[16]

The HAC recognized that the project site was not within the geographical boundaries of the original sewer district under phase I of the sewer plan, but noted that the town had already modified the sewer plan by expanding sewer access through the spur on Electric Avenue. The HAC found that the town must have contemplated that the expansion would increase the number of residences with legal access to sewer, and had allowed market-rate homes to connect to the Electric Avenue sewer spur. It also found that the town must have anticipated that the project's parcel on Electric Avenue would have access to sewer service because it installed a sewer connection directly in front of the parcel. It also noted that the Electric Avenue Drive-in Theater site, which had been designated for affordable housing but was instead approved for use as a self-storage facility, obtained its sewer connection through the Electric Avenue spur.[17] Finally, the board does not claim that the project would stress the capacity of its wastewater treatment facilities.[18]

[15]To ensure wetlands protection, the town's conservation commission had granted an order of conditions governing the installation of the sewer connection from Electric Avenue.

[16]The HAC also found that the town planner had asked Hollis Hills whether it would agree to include the site in a smart growth zoning district under G. L. c. 40R, which requires that not less than twenty per cent of the residential units constructed in projects of more than twelve units be affordable. G. L. c. 40R, § 6 (4).

[17]The project's other sewer line, along Carr Avenue to Whalom Road, was not part of phase I of the sewer plan but was identified in the phase I plan as a future sewer expansion. The town's director of public works asked Hollis Hills to design the sewer line to allow abutters on Crest Avenue to hook into the Carr Avenue sewer line Hollis Hills would build.

[18]The town recently gave a sewer connection to a 240-unit market-rate

We conclude that these findings are supported by substantial evidence and adequately support the HAC's conclusion that the proposed project is not inconsistent with the town's master planning and would not undermine those plans. In deciding the weight to be given to a deviation from a town's master plans, the HAC is entitled to look beyond the letter of the plan and consider its spirit and underlying purpose, recognizing that long-term plans often need to be adapted to changes in circumstances. Where, as here, the town's affordable housing plan failed to produce any affordable housing that would qualify for the SHI and where the proposed project is not inconsistent with, and would not undermine, the town's master plans, the HAC's conclusion that this local concern did not outweigh the regional need for low and moderate income housing was supported by substantial evidence.

3. *Infectious invalidity.* One of the parcels of land that comprise the project site is the parcel on Electric Avenue that abuts the sewer line (Electric Avenue parcel). In 2002, Fred Laberge owned an adjoining parcel at 321 Electric Avenue, where he operated an automobile salvage business in the name of Sky Cycle, Inc. (Sky Cycle); Sky Cycle owned the Electric Avenue parcel.[19] That year, Laberge applied for and received development plan review approval from the town planning board under a town zoning bylaw to construct an addition to an existing warehouse that would straddle the lot line between 321 Electric Avenue and the Electric Avenue parcel, and built the addition.[20] On June 2, 2005, Sky Cycle sold the Electric Avenue parcel to a realty trust related to Hollis Hills, which transferred it to Hollis Hills on August 25, 2005.

housing development that is only 500 feet from the project site. The board argues that the proposed project is inconsistent with this development because it will introduce a "competing project" in a weak housing market. The HAC properly found that this claim of competition is "without merit." A local concern of a board may be considered only where "applied as equally as possible to both subsidized and unsubsidized housing." G. L. c. 40B, § 20. In evaluating a comprehensive permit application, a local board may not consider whether the proposed subsidized housing will compete with market-rate housing built or scheduled to be built in the town.

[19]Fred Laberge was the sole officer and director of Sky Cycle, Inc.

[20]The board treated the two parcels as merged, even though one was owned individually by Laberge and the other was owned by Sky Cycle, Inc.

Once the Electric Avenue parcel was sold, the two parcels were no longer merged, and the 321 Electric Avenue parcel did not conform to the zoning bylaw's setback requirements because the warehouse straddled the lot line. On January 3, 2007, eighteen months after Sky Cycle sold the Electric Avenue parcel to the realty trust, but only five months after Hollis Hills confirmed with the town that it would connect to the public sewer through the Electric Avenue parcel, the town ordered Laberge to remove the building. Hollis Hills offered to cure the zoning violation by reconveying enough land from the Electric Avenue parcel to provide adequate setback, while still retaining the frontage it needed to connect to the sewer line on Electric Avenue. The town's building inspector informed Hollis Hills that the proposed reconveyance would "correct the zoning and site conditions necessary for compliance," but the town never replied to Hollis Hills's reconveyance proposal. Instead, the town defended the tear-down order in the Housing Court, where the order was affirmed on December 12, 2007. On June 19, 2008, the town entered into a settlement agreement to resolve the tear-down litigation. Under the terms of the settlement agreement, the town could enforce the tear-down order after the earlier of either (a) one year after the exhaustion of all appeals from Hollis Hills's comprehensive permit application or (b) December 31, 2011, unless the new owner of 321 Electric Avenue reacquired the *entire* Electric Avenue parcel, which would have left Hollis Hills with no access to the sewer line on Electric Avenue.

The board claims that Sky Cycle's sale of the Electric Avenue parcel to the realty trust violated the common-law principle of infectious invalidity, which provides that "a property owner may not create a valid building lot by dividing it from another parcel rendered nonconforming by such division." *81 Spooner Rd., LLC* v. *Zoning Bd. of Appeals of Brookline*, 461 Mass. 692, 694 n.6 (2012). The HAC, in reaching its decision, assumed, without deciding, that the conveyance of the Electric Avenue parcel to the realty trust violated the planning board's development plan review, and that the Electric Avenue parcel was in zoning nonconformity as a result of the violation.

We find no error in the HAC's denial of the board's motion to dismiss the developer's appeal, which claimed that, because

the sale of the Electric Avenue parcel rendered 321 Electric Avenue a nonconforming lot, Hollis Hills did not control the Electric Avenue portion of the site and, therefore, was not eligible to apply for a comprehensive permit. See 760 Code Mass. Regs. § 56.04(1)(c) (2008). Under the regulations in effect at the time of the application to the board, see 760 Code Mass. Regs. § 56.08(3)(c) (2008), either a preliminary determination by the subsidizing agency that the applicant has "sufficient interest in the site" or "a showing" that the applicant owns the proposed site is "conclusive evidence" of site control. 760 Code Mass. Regs. § 31.01(3) (2004). Here, Hollis Hills provided three purchase and sale agreements, along with subsequent extensions of those agreements, which established colorable title to the Electric Avenue parcel at the time the application was filed. Infectious invalidity may affect the owner's ability to build on an infected parcel, but it does not affect ownership of the parcel. See *Alley* v. *Building Inspector of Danvers*, 354 Mass. 6, 6-7 (1968) (building inspector properly denied building permit on lot created by making adjacent lots nonconforming). See also *Somerset Sav. Bank* v. *Chicago Title Ins. Co.*, 420 Mass. 422, 428 (1995) (restrictions on use of property do not affect owner's title to property).

The HAC correctly recognized that a zoning or planning board violation is a local concern, not a violation of State law that the HAC has no authority to override, noting that, because "it is within the power of the Planning Board to modify its previous condition affecting the Electric Avenue parcels, it is within the power of the [zoning board of appeals] or [the HAC] to determine that the Development Plan Review does not constrain the development of this project." The HAC concluded that this local concern was insufficient to outweigh the regional need for affordable housing, and waived any zoning and planning board violations on the Electric Avenue parcel so that the proposed project may proceed.[21]

We conclude that the HAC's factual findings were supported by substantial evidence and that the HAC did not abuse its discretion in concluding that the balance of interests in these

---

[21]The HAC was careful to clarify that it did not have the power to waive any zoning nonconformity with respect to the 321 Electric Avenue parcel.

circumstances favored the regional need for affordable housing rather than the local concern of a zoning nonconformity. Here, Hollis Hills offered to cure the infectious invalidity but the town rejected the offer and entered into a settlement agreement that was designed to scuttle the proposed project rather than cure the zoning nonconformity. Under the settlement, the town may still cure the infectious invalidity by enforcing the agreement to tear down the building that was the source of the zoning violation.

4. *Denial of stay.* In a single sentence in its appellate brief that references arguments made to the HAC and included in the record, the board claims that the HAC erred in refusing to stay the proceedings until the Governor had named a fifth member to the HAC. See G. L. c. 23B, § 5A (three members of HAC are appointed by department director and remaining two by Governor). Because the board did not argue this issue in its appellate brief, we need not reach it. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975) ("The appellate court need not pass upon questions or issues not argued in the brief"). We nonetheless choose to decide it and find it meritless. Three members of the HAC may decide an appeal. See *Board of Appeals of Maynard* v. *Housing Appeals Comm.*, 370 Mass. 64, 66 (1976). Here, the appeal was decided by four members.

*Conclusion.* The judgment affirming the order of the HAC is affirmed.

*So ordered.*