NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-680                                          Appeals Court

EISAI, INC., & others[1] vs.  HOUSING APPEALS COMMITTEE
& another.[2]

No. 15-P-680.

Suffolk.     March 8, 2016. - June 20, 2016.

Present:  Hanlon, Sullivan, & Massing, JJ.

Housing.  Zoning, Housing appeals committee, Comprehensive
     permit, Person aggrieved.  Practice, Civil, Zoning appeal,
     Standing.

Civil action commenced in the Superior Court Department on
March 11, 2014.

The case was heard by Edward P. Leibensperger, J., on
motions for judgment on the pleadings.

Christopher Robertson (Jonathan D. Witten with him) for the
plaintiffs.
     Suleyken D. Walker for Housing Appeals Committee.
     Kevin P. O'Flaherty for Hanover R.S. Limited Partnership.

_____

[1] Andover Five, LLC; MKS Instruments, Inc.; Philips
Electronics North America, Inc.; and RREEF America REIT III
Corp. Z1.

[2] Hanover R.S. Limited Partnership.

MASSING, J.  This appeal concerns the standards that defendant housing appeals committee (HAC) applies when it reviews the decision of a local zoning board of appeals to deny an application under the Comprehensive Permit Act, G. L. c. 40B, §§ 20-23 (act), based on municipal planning concerns.

The plaintiffs, owners and lessors of commercial and industrial properties neighboring the proposed housing development (hereinafter, abutters or, in context, interveners), appeal from a judgment of the Superior Court affirming the HAC's decision directing the zoning board of appeals for the town of Andover (board) to issue a comprehensive permit to defendant Hanover R.S. Limited Partnership (developer).  The abutters claim that the HAC impermissibly applied a new standard, not contained in any statute, regulation, or previous HAC decision, in evaluating Andover's municipal planning efforts.  In the alternative, they claim that the HAC erroneously applied the applicable standard.  The defendants, for their part, contend that the abutters lack standing to bring this appeal. Concluding that the abutters have standing, we reach the merits and affirm the judgment of the Superior Court affirming the HAC's decision.

Background.  On August 19, 2011, the developer filed an application for a comprehensive permit to build a mixed income rental housing development to be known as the "Lodge at Andover"

within an existing office and industrial park. The proposed
location for the residential development, 30 Shattuck Road, is
mostly within Andover's River Road industrial D district, a
commercial and industrial area in the northernmost part of
Andover, near the River Road exit of Interstate Route 93.[3]
Shattuck Road, a dead end, and Tech Drive, a small looping road
off of Shattuck Road, make up the office and industrial park
consisting of ten large businesses and one vacant lot:  the
proposed site. The office and industrial park houses offices,
research and development facilities, and some light industrial
operations.[4] After unsuccessfully marketing the vacant lot for
commercial development, the previous owner entered into a
purchase and sale agreement with the developer, which intended
to build the housing complex. The development, as currently
planned, is to consist of 248 rental units in four buildings, a
playground, a swimming pool, and a 5,000-square-foot clubhouse;
twenty-five percent of the units will be reserved for affordable
housing.

---

[3] A very small "dog-leg" portion of the parcel is zoned
single-family residential C, and some single-family homes in
this zoning district abut the rear of the parcel. All of the
proposed construction will be located within the River Road
industrial D district.

[4] A ninety-six-unit affordable housing development called
"Casco Crossing," approved by the board in 2003, is located
within the River Road industrial D district, but outside the
office and industrial park. It also abuts the back of the
project site.

At the time of the developer's application for a comprehensive permit, the percentage of affordable housing in Andover was 9.3 percent, creating a rebuttable presumption that the local need for affordable housing outweighed other local concerns.[5]  Nonetheless, after numerous public hearings, the board denied the developer's application in a decision dated September 7, 2012, on the ground that the "proposed project is inconsistent with decades of municipal planning, economic development strategies, and planning with owners and tenants of the abutting industrial properties[,] . . . most notably, the rezoning of the locus and abutting properties to accommodate and develop a modern, competitive, and viable industrial park and industrial center."  The board noted that industrial and commercial uses generate noise, dust, vibration, and truck traffic during their extended hours of activities, which "will pose a threat to the public health and safety of the occupants of the development."  Thus, the board concluded that "[t]he stated purpose of the Industrial 'D' zoning district is inexorably inconsistent with residential uses."

The developer appealed to the HAC under G. L. c. 40B, § 22. The HAC granted the abutters permission to participate in the

---

[5] See Zoning Bd. of Appeals of Holliston v. Housing Appeals Comm., 80 Mass. App. Ct. 406, 414 (2011), and discussion infra.

proceedings as interveners.[6] In a thoughtful and thorough decision dated February 10, 2014, the HAC directed the board to issue a comprehensive permit. The board did not appeal from the final decision of the HAC; however, the interveners sought judicial review in the Superior Court under G. L. c. 30A, § 14. In a decision dated January 2, 2015, acting on cross motions for judgment on the pleadings, a Superior Court judge ordered the entry of judgment for the defendants (the developer and the HAC), affirming the HAC's decision.

Discussion. 1. Standing. The defendants assert, as they did in Superior Court, that the interveners are not entitled to appeal as persons aggrieved by the HAC's decision because they have not demonstrated a substantial injury to a direct and certain violation of a private right.

Initially, the only parties in the HAC proceedings were the developer, which had the right to appeal from the denial of its application, see G. L. c. 40B, § 22, and the board. "An abutter, or other aggrieved third party, has no right to appeal to the HAC, and may participate in the applicant's appeal only with the permission of the presiding officer in the HAC proceeding." Taylor v. Board of Appeals of Lexington, 451 Mass. 270, 275 (2008). The abutters sought to intervene under 760

---

[6] A sixth intervener participated in the HAC proceedings. Only five have joined in this appeal.

Code Mass. Regs. § 56.06(2)(b) (2008), which allows for intervention by "any person showing that he or she may be substantially and specifically affected by the proceedings." The presiding officer determined that "the interests of all six businesses are distinct from the interests of the Board" and were sufficient to grant intervention.[7]

"Mere participation in the administrative process does not confer standing to raise a claim in the Superior Court." Ginther v. Commissioner of Ins., 427 Mass. 319, 324 (1998). See Mostyn v. Department of Envtl. Protection, 83 Mass. App. Ct. 788, 792 (2013). Rather, the interveners must demonstrate that they are persons aggrieved by the HAC decision. General Laws c. 40B, § 21, inserted by St. 1969, c. 774, § 1, provides that "[a]ny person aggrieved by the issuance of a comprehensive permit or approval may appeal to the court as provided in [G. L. c. 40A, § 17]." "While the words 'person aggrieved' are not to be narrowly construed, the Legislature has 'intentionally limited the class of parties with standing to challenge a comprehensive permit.'" Standerwick v. Zoning Bd. of Appeals of Andover, 447 Mass. 20, 26 (2006) (citations omitted) (Standerwick). "Specifically, a 'person aggrieved' . . . must assert 'a plausible claim of a definite violation of a private

_____

[7] We pass over the question whether the HAC, having permitted the abutters to intervene on this ground, may properly be heard on appeal to argue against its own prior determination.

right, a private property interest, or a private legal interest." Id. at 27, quoting from Harvard Square Defense Fund, Inc. v. Planning Bd. of Cambridge, 27 Mass. App. Ct. 491, 493 (1989).

A mere economic interest "is clearly not a concern that the G. L. c. 40B regulatory scheme is intended to protect." Id. at 30. However, the record plainly establishes that at least one of the interveners is an abutter to the project site.[8] "As abutters, the plaintiffs are entitled to a rebuttable presumption that they are 'persons aggrieved' under the act."[9] Id. at 33. To rebut the abutting interveners' presumption of

---

[8] Intervener Andover Five, LLC, owns 20 Shattuck Road, the parcel bordering 30 Shattuck Road to the south. The properties of three other interveners appear to be across the street from or within 300 feet of the site, "which in either event would give them a presumption of standing to challenge the issuance of a comprehensive permit." Standerwick, supra at 22 n.4. The fifth intervener, Philips Electronics North America, Inc., is located within the River Road industrial D district but is not an abutter. Because we find that at least one intervener is an abutter with standing, we may reach the merits without further considering the standing of the others. See Martin v. Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints, 434 Mass. 141, 145 (2001).

[9] "This presumption originates in our jurisprudence concerning G. L. c. 40A, . . . but its reasoning -- that those entitled to notice of the proceedings are presumed to have the requisite interest -- applies with equal force in the context of challenges to comprehensive permits pursuant to G. L. c. 40B." Standerwick, supra. See 760 Code Mass. Regs. § 56.06(2)(b) (2008) ("any person shall be allowed to intervene to the extent that he or she would have standing as a person aggrieved to appeal the grant of a special permit in accordance with M.G.L. c. 40A, § 17").

standing, the defendants must support their challenge with evidence to the contrary. See id. at 34-35 ("an abutter is presumed to have standing until the defendant comes forward with evidence to contradict that presumption"); Barvenik v. Aldermen of Newton, 33 Mass. App. Ct. 129, 131-132 (1992) (defendant must offer evidence to rebut abutters' presumption of aggrieved person status). See also 81 Spooner Rd., LLC v. Zoning Bd. of Appeals of Brookline, 461 Mass. 692, 700 (2012) (in zoning context, presumption of standing can be rebutted by offering evidence "warranting a finding contrary to the presumed fact").

The defendants have offered no evidence to rebut the presumption. In Superior Court, the defendants challenged the interveners' standing based only on the mistaken assertion that they were not abutters. Because "no evidence was presented . . . that controverted the plaintiffs' presumption of standing," the interveners, as abutters, "were entitled to rely entirely on their presumed status of being aggrieved parties." Watros v. Greater Lynn Mental Health & Retardation Assn., 421 Mass. 106, 111 (1995). Accordingly, we proceed to the merits of the appeal.

2. HAC decision directing issuance of comprehensive permit. a. Overview. The act "is designed to facilitate the development of low and moderate income housing in communities throughout the Commonwealth." Zoning Bd. of Appeals of

_Holliston_ v. _Housing Appeals Comm_., 80 Mass. App. Ct. 406, 413
(2011) (_Holliston_).  To carry out the legislative purpose, "the
act establishes a streamlined comprehensive permitting
procedure, . . . permitting a developer to file a single
application to the local zoning board of appeals for
construction of low or moderate income housing."  _Standerwick_,
447 Mass. at 29, citing G. L. c. 40B, § 21.  See _Dennis Hous.
Corp._ v. _Zoning Bd. of Appeals of Dennis_, 439 Mass. 71, 76
(2003) ("act was intended to remove various obstacles to the
development of affordable housing, including regulatory
requirements that had been utilized by local opponents as a
means of thwarting such development in their towns").

A developer may appeal a board's denial of an application
for a comprehensive permit to the HAC.[10]  See G. L. c. 40B, § 22.
"The HAC's review is limited to the issue whether 'the decision
of the board of appeals was reasonable and consistent with local
needs.'"[11]  _Holliston_, _supra_ at 414, quoting from G. L. c. 40B,

_____

[10] The HAC is a five-member body within the Department of
Housing and Community Development.  See G. L. c. 23B, § 5A.

[11] Under G. L. c. 40B, § 20, inserted by St. 1969, c. 774,
§ 1, "requirements and regulations shall be considered
consistent with local needs if they are reasonable in view of
the regional need for low and moderate income housing considered
with the number of low income persons in the city or town
affected and the need to protect the health or safety of the
occupants of the proposed housing or of the residents of the
city or town, to promote better site and building design in
relation to the surroundings, or to preserve open spaces, and if

§ 23, as amended by St. 1998, c. 161, § 261.  See 760 Code Mass. Regs. § 56.07(1)(b) (2008) ("In the case of the denial of a Comprehensive Permit, the issue shall be whether the decision of the Board was Consistent with Local Needs").  The local needs in question concern the availability of affordable housing. Whether a board's decision is consistent with local needs refers to whether a town's "valid planning objections to the proposal, such as health, site design, and space," Zoning Bd. of Appeals of Wellesley v. Ardemore Apartments Ltd. Partnership, 436 Mass. 811, 815 (2002) (Wellesley), reasonably accommodate affordable housing.

Where, as here, a town's stock of affordable housing is below ten percent at the time of the application, and the town has not otherwise fulfilled its minimum housing obligation, see Wellesley, supra at 815 n.10; G. L. c. 40B, § 20; 760 Code Mass. Regs. § 56.03(1) (2008), "the regulations and our cases provide that there is 'a rebuttable presumption that there is a substantial Housing Need which outweighs Local Concerns,'"[12]

_____

such requirements and regulations are applied as equally as possible to both subsidized and unsubsidized housing."

[12] Like the phrase "local needs," the phrase "local concerns" is also a term of art, defined as "the need to protect the health or safety of the occupants of a proposed Project or of the residents of the municipality, to protect the natural environment, to promote better site and building design in relation to the surroundings and municipal and regional

Zoning Bd. of Appeals of Sunderland v. Sugarbush Meadow, LLC, 464 Mass. 166, 171 (2013) (Sunderland), quoting from 760 Code Mass. Regs. § 56.07(3)(a) (2012).

Finally, under G. L. c. 40B, § 22, the HAC's decision may be reviewed by a judge of the Superior Court in accordance with G. L. c. 30A. The reviewing judge considers whether the HAC's decision was arbitrary, capricious, lacking substantial evidence, or otherwise contrary to the law, and whether the substantial rights of any party have been prejudiced. See Sunderland, supra at 172, citing G. L. c. 30A, § 14(7). The substantial evidence standard is particularly appropriate "'in light of the heavy burden borne by a local board that denies a comprehensive permit application' to prove 'a specific health or safety concern of sufficient gravity to outweigh the regional housing need.'" Holliston, 80 Mass. App. Ct. at 414-415 (citation omitted).

b. Developer's burden on appeal to HAC. As an initial matter, the abutters contend that the HAC should not even have reached the ultimate question whether Andover's municipal planning needs outweighed local needs for affordable housing because the developer's application, on its face, was not worthy of consideration. "Before the HAC, a developer whose

_____

planning, or to preserve Open Spaces." 760 Code Mass. Regs. § 56.02 (2008).

comprehensive permit has been denied may establish a prima facie case by proving 'that its proposal complies with federal or state statutes or regulations, or with generally recognized standards as to matters of health, safety, the environment, design, open space, or other matters of Local Concern.'" Id. at 415, quoting from 760 Code Mass. Regs. § 56.07(2)(a)(2) (2008). "The regulatory scheme governing applications for comprehensive permits . . . requires only preliminary plans" showing that the proposal conforms to generally recognized standards. Ibid., citing 760 Code Mass. Regs. § 56.05(2) (2008).

In contending that the evidence proffered by the developer was insufficient to establish a prima facie case, the abutters take issue with the testimony of the developer's expert witness based on his unfamiliarity with Andover's planning history. Furthermore, they argue that other evidence before the HAC contradicted much of the testimony of the developer's witnesses. In determining that the developer met its burden of establishing a prima facie case, the HAC credited the "extensive testimony" of the developer's expert, whom it characterized as "an experienced municipal planner," together with the testimony of the manager of the proposed project, "an experienced real estate development specialist."

"[W]here, as here, the HAC heard competing experts, '[i]t is for the agency, not the reviewing court, to weigh credibility

of witnesses.'"  Sunderland, 464 Mass. at 184, quoting from MacLean v. Board of Registration in Nursing, 458 Mass. 1028, 1030 (2011).  "[W]e must indulge all rational presumptions in favor of the validity of the HAC's determinations, including its choice between two fairly conflicting views, giving due weight to its experience, technical competence, and specialized knowledge."  Holliston, supra.  We discern no error in the HAC's conclusion that the developer established a prima facie case.

c.  HAC's evaluation of municipal planning concerns.  Once the developer established its prima facie case, the burden shifted to the board to prove "first, that there is a valid health, safety, environmental, design, open space, or other Local Concern which supports such denial, and then, that such Local Concern outweighs the Housing Need."  760 Code Mass. Regs. § 56.07(2)(b)(2) (2008).  See Holliston, supra.  The abutters assert that the proposed project's grave incompatibility with Andover's municipal master plan is a compelling local concern that outweighs regional housing needs.  See Zoning Bd. of Appeals of Lunenburg v. Housing Appeals Comm., 464 Mass. 38, 48-49 (2013) (Lunenburg) ("The HAC recognized that a town's long-term comprehensive planning efforts, 'when expressed in a bona fide, effective master plan or comprehensive plan,' may be so substantial a local concern as to outweigh the regional need for affordable housing").

In weighing a town's adherence to its master plan against its housing needs, the HAC has developed a two-part analysis:

> "First, it determine[s] whether the master plan was a legitimate local concern by asking three questions, all of which [have] to be answered in the affirmative for the master plan to be weighed as a local concern: '(1) Is the plan bona fide? (Was it legitimately adopted, and, more importantly, does it continue to function as a viable planning tool in the town?); (2) Does the plan promote affordable housing? and (3) Has the plan been implemented in the area of the site?' After finding that the town's master plan met this test, the HAC turn[s] to the second part of the analysis: the weight to be given to the master plan as a local concern."

Id. at 49.

The HAC determined that Andover's master planning passed the three-question threshold test. The HAC found that Andover had "a solid history of planning," having engaged in master planning since 1956, resulting in not only a bona fide master plan, but also in a community development plan and a housing plan, both addressing affordable housing. The HAC further found that the master plan and ancillary plans had been implemented throughout Andover, including in the area of the project site.

Accordingly, the HAC turned to the second, and dispositive, part of the analysis -- whether Andover's recognized planning interests outweigh its affordable housing needs. The statute that defines the HAC's oversight role does not provide detailed guidance in the application of this test. It prescribes only the ultimate issue: "The hearing by the [HAC] shall be limited

to the issue of whether, in the case of the denial of an application, the decision of the board of appeals was reasonable and consistent with local needs."  G. L. c. 40B, § 23, as amended by St. 1998, c. 161, § 261.  The HAC's regulations, specifically 760 Code Mass. Regs. § 56.07(3)(b)-(h) (2008), provide additional guidance in weighing evidence of local concerns such as health, safety, and the environment, see § 56.07(3)(d); open space, see § 56.07(3)(f); and municipal and regional planning, see § 56.07(3)(g).

In previous decisions, the HAC had focused on two questions in determining how much weight to give a town's master plan: "first, whether the affordable housing plan aspect of the master plan 'has actually shown results' in terms of the construction of affordable housing, and second, whether the proposed project is inconsistent with and would undermine the plan to a significant degree."  Lunenburg, supra.  Here, noting that the tension between affordable housing and broad municipal planning efforts is a recurring issue, and that the regulations "ha[d] recently been strengthened to explicitly include housing planning,"[13] the HAC endeavored "to clarify the standard we apply," by enunciating a flexible four-factor test:

---

[13] In this regard, the HAC quoted from 760 Code Mass. Regs. § 56.07(3)(g) (2008), which requires the HAC to receive evidence and consider "1.  a municipality's master plan, comprehensive plan, housing plan, Housing Production Plan, or community

"Consistent with our precedents and regulations, the analysis of these complex, interrelated interests can be broken into several factors. The Board need not introduce evidence with regard to each of these, but it must introduce enough evidence to cumulatively establish a local concern of sufficient weight to outweigh the regional need for affordable housing. The Board may establish the weight of its local planning concern by demonstrating the following:

"1. The extent to which the proposed housing is in conflict with or undermines the specific planning interest.

"2. The importance of the specific planning interest, under the facts presented, measured, to the extent possible, in quantitative terms . . . .

"3. The quality . . . of the overall master plan (or other planning documents or efforts) and the extent to which it has been implemented. A very significant component of the master plan is the housing element of that plan (or any separate affordable housing plan). The housing element must not only promote affordable housing, but to be given significant weight, the Board must also show to what extent it is an effective planning tool. . . .

"4. The amount [and type] of affordable housing that has resulted from affordable housing planning."

The abutters assert that the HAC did not merely clarify the test it had been applying for decades but, rather, "moved the goalposts, . . . inventing a new scheme . . . in a transparently outcome-driven 'four-part analysis.'" We disagree. The four so-called "new" factors delineated by the HAC are simply a more detailed explication of the two factors previously described in

_____

development plan; 2. the applicable regional policy plan; and 3. the results of the municipality's efforts to implement such plans."

the Lunenburg decision.[14]  The first two factors in the restated test assist the HAC in identifying specific municipal planning interests and determining the extent to which the proposed plan interferes with those interests.  The third and fourth factors attempt to quantify the extent to which municipal planning has actually shown results in terms of promoting affordable housing. All four factors address the ultimate issue whether local concerns relating to municipal planning outweigh the local need for affordable housing.

"It is a recognized principle of administrative law that an agency may adopt policies through adjudication as well as through rule-making."  Arthurs v. Board of Registration in Med., 383 Mass. 299, 312-313 (1981).  Even so, the test the HAC enunciated here was entirely consistent with its prior policies and was well within its statutory and regulatory authority.

---

[14] Indeed, the four-factor test is not appreciably different from the test HAC applied in Stuborn Ltd. Partnership vs. Barnstable Bd. of Appeals, Housing Appeals Committee, No. 98-01, slip op. at 3 (Sept. 18, 2002), which the abutters cite as "the HAC's own established and reported standard regarding municipal planning."  The decision states that if a town's comprehensive plan satisfies the three-question threshold test, the HAC must then determine "the amount of weight [to] give to the plan," the question whether "the proposed housing actually [would] undermine the plan to a significant degree," and "whether the housing element of the comprehensive plan has actually shown results."  Id. at 3 & n.5.  "That is, we consider the totality of the town's planning interests, and determine whether those interests are sufficient to outweigh the regional need for affordable housing."  Id. at 3.

One cautionary observation is in order. In Board of Appeals of Hanover v. Housing Appeals Comm., 363 Mass. 339, 367 (1973), the decision that established the constitutional validity of the act, the court stated that a municipality's failure to meet its minimum housing obligations "will provide compelling evidence that the regional need for housing does in fact outweigh the objections to the proposal." In the conclusory paragraph of its analysis, the HAC here, seizing on the Supreme Judicial Court's use of the word "compelling," commented that "the relatively low goal of 10% is a minimum, and that well more than 10% of most communities' housing stock would need to be low or moderate income in order to satisfy the growing need for affordable housing." To the extent this statement can be read as raising the ten-percent threshold, such an action would exceed the HAC's statutory and regulatory authority. When a town that has fulfilled its minimum housing requirement denies a comprehensive permit, the HAC is compelled to affirm the decision. See G. L. c. 40B, §§ 20, 23.

While the HAC's phrasing was perhaps inapt, we read this remark as a rhetorical flourish, not as an expression of a new standard. It is uncontested that Andover was below the ten-percent threshold when the developer applied for the comprehensive permit. Under well-established law, this fact created a rebuttable presumption that the need for affordable

housing outweighed local concerns. As discussed in the next section, in determining whether Andover had rebutted that presumption, the HAC properly balanced Andover's municipal planning efforts against the local need for affordable housing.

d. Review of HAC's decision. Turning to the HAC's resolution of the ultimate issue, "the agency's decision must be upheld if supported by 'such evidence as a reasonable mind might accept as adequate to support a conclusion,' and we must indulge all rational presumptions in favor of the validity of the agency's determinations." Middleborough v. Housing Appeals Comm., 449 Mass. 514, 528 (2007) (citation omitted).

The HAC considered each of the specific planning interests raised by the board in denying the developer's application: that housing in the River Road industrial D district would conflict with longstanding efforts to preserve the area for commercial and industrial uses, that the proposed residential use would conflict with the surrounding commercial and industrial uses, and that the use of the site for housing rather than commerce would have a negative impact on municipal tax revenues.

The HAC acknowledged that the construction of housing at the site was contrary to Andover's interest of developing all the lots in the office and industrial park for commercial use. In this regard, it considered the board's "strongest argument"

to be that, based on unrebutted testimony, a business on the site could generate from 400 to 800 jobs. However, the HAC found that "it is by no means apparent that a business employing those workers would not simply locate in another part of Andover." Indeed, the fact that this hoped-for employer had not materialized on the site was the very reason the previous owner sold it to the developer. Moreover, the HAC noted that the area was already well established as a business zone, and that because the proposed housing development would be built on the last vacant lot, the board "cannot point to possible foregone employment associated with future businesses that might be reluctant to locate in a subdivision whose future is uncertain." Accordingly, the HAC concluded, "On the evidence presented to us, we find that the importance of the interest in job creation in this situation is relatively low."

With respect to the claimed "important interest in preventing conflicts that may arise after construction between the users of adjacent residential and commercial industrial sites," the HAC found the evidence vague and speculative. None of the abutters' witnesses on this issue was able to provide specific evidence of incompatibility. The evidence showed that "all of the ten existing business sites contain offices," and "while many of them also contain research and development activities or manufacturing, their operations are not of the

sort that would generally be perceived as offensive."  One witness described "noise disturbance and heavy truck traffic," but another found no "noise vibrations, fumes, odors, truck traffic or the like."  Although the HAC acknowledged that minor conflicts could occur, such as "children occasionally riding bicycles on private property," it concluded that the interest "in preventing conflicts between residential and office and industrial uses at this location is of negligible importance."

Finally, when reviewing the concern regarding municipal tax revenue, the evidence showed that the potential property tax on a new industrial or commercial facility, from $600,000 to $1 million annually, would be largely offset by tax benefits that Andover offers to business property owners.  The total annual property tax revenue from all ten existing businesses was only $1.5 million.  The HAC found the evidence to be "ambiguous, and without further elaboration it is insufficient to show that foregone [sic] tax revenues are of great importance."

Turning to the quality of the master plan and the results achieved in terms of affordable housing, the HAC identified as a "major shortcoming" the fact that "multifamily housing is not permitted as of right anywhere in the town."  While the master plan does give "careful thought" to affordable housing and provides "effective planning tools," the HAC found that the "evidence is not detailed, however, nor is it clear to what

extent town staff or volunteer groups have been assigned responsibility for specific actions and have followed through on those actions."  Thus, although the HAC found the master plan to be "generally implemented" and of "moderate quality," it concluded that Andover had done little to encourage affordable housing.  The affordable housing that had been built was not "as a result of the town's planning efforts" but, rather, "despite the town's master plan and affordable housing plan."

Balancing what it found to be relatively weak interests asserted by the board and the abutters against Andover's failure to meet the statutory minimum ten-percent affordable housing obligation, the HAC concluded that the board "has not sustained its burden of proof, but that, on the contrary, the local concerns it has asserted do not outweigh the regional need for affordable housing."  "[W]e give 'due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it,' G. L. c. 30A, § 14(7), and we 'apply all rational presumptions in favor of the validity of the administrative action.'" Lunenburg, 464 Mass. at 43, quoting from Middleborough v. Housing Appeals Comm., 449 Mass. at 524.  Moreover, we "may not displace an administrative board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."

Zoning Bd. of Appeals of Wellesley v. Housing Appeals Comm., 385 Mass. 651, 657 (1982).  Giving the appropriate deference to the HAC, we hold that its decision to require Andover to issue a comprehensive permit to the developer is supported by substantial evidence, and is not arbitrary, capricious, or otherwise contrary to the law.  See Lunenburg, supra; Sunderland, 464 Mass. at 172.

Judgment affirmed.