STANLEY LEE *vs.* ALLIED SPORTS ASSOCIATES, INC.

Middlesex.    May 6, 1965. — July 16, 1965.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER & KIRK, JJ.

*Contract,* Limiting liability, Validity. *Negligence,* Contractual limitation of liability. *Release. Automobile Race Track. Waiver. Practice, Civil,* Waiver. *Words,* "Entrant."

A paper, entitled "Release Sheet," stating in printing at the top that an entrant to an automobile race track pit "in signing this release" released and discharged the track owner from all liability for personal injuries which the entrant might receive there, as matter of law effectively released the track owner from liability for negligence to an entrant struck and injured in the pit by a wheel flung from a racing car where it appeared that the paper lay on a table at the entrance gate to the pit with the printed statement at the top unconcealed, that the signing of the paper was a condition precedent to admission to the pit, that the injured entrant was not "forced" to sign the paper and there was no misrepresentation as to its contents, and that he signed the paper without

reading it as he had opportunity to do while in line at the table, even though the track owner had not made him aware of the limitation upon liability so stated therein. [550–551]

In an action against the owner of an automobile race track by one struck and injured by a wheel flung from a racing car while he was in the track pit, a contention by the plaintiff that he was not bound by a release of the defendant from liability which the plaintiff had signed, without reading, before being admitted to the pit because it designated a signer as an "entrant" and "entrant" referred only to persons actively competing in a race, and he, not being an owner, driver or mechanic, was not within its terms, was without merit where it appeared that the plaintiff had designated himself as a "mechanic" in signing an application for membership in a racing association controlling the pit and as a "driver" in signing the release, and that signing the application and release was a condition precedent to admission to the pit. [551–552]

Upon a bill of exceptions by the defendant in an action tried in the Superior Court, an issue raised by the plaintiff in this court but not in the Superior Court was not considered. [552]

Tort. Writ in the Superior Court dated May 16, 1962.

The action was tried before *Barron, J.*

*Noel G. Posternak (Thomas D. Burns* with him) for the defendant.

*Edward J. Barshak (Bertram A. Sugarman & Steven J. Cohen* with him) for the plaintiff.

Kirk, J. This is an action of tort brought by the plaintiff (Lee) to recover for personal injuries sustained by him when he was struck by a wheel which had become detached from a racing car at the Westboro Speedway on May 20, 1960. The case was referred to an auditor who found for the defendant Allied Sports Associates, Inc. (Allied) on the ground that a "release sheet" signed by Lee in circumstances hereinafter related operated to bar the action. At the trial, where the extent of Lee's injuries was not disputed, the jury returned a verdict for Lee. Allied's exceptions are to the denial of its motion for a directed verdict and to certain instructions given to the jury.

In considering the denial of the motion for a directed verdict as it relates to the issue of the release we state the relevant evidence in its aspect most favorable to Lee. Allied was the owner of the speedway at Westboro and

was the sole applicant for and holder of the license to conduct auto racing there. It was also the holder of a common victualer's license and wine and malt beverage license for the premises. The Westboro Speedway was an oval with straightaways on the north and south sides. Grandstands were parallel with and behind the straightaways. The racing strip was made of boards and was approximately forty feet wide. On the straightaways there was a slight grade leading up from the inside of the oval which at the curves increased to a bank of approximately forty-five degrees. "At the top of each end of the track there was a reinforced embankment about 3 feet high and 4 feet thick going around the end." A chain link fence about six feet high and a wide wire mesh fence ten feet high were erected between the track and the grandstand. A similar wire fence about ten feet high was erected behind the embankment at both ends of the track.

To the east of the track was a large open area called the pit. In the pit the automobiles which were to participate in the races were kept for storage, pre-race tuneups, repairs and similar operations. In this area also the various drivers, mechanics and other authorized personnel congregated.

By some arrangement, which is not clear on the record, the pit was under the control of Atlantic Auto Racing Association (Atlantic). Atlantic controlled all admissions to the pit area. Only members of Atlantic and track officials were permitted to enter.

On the evening of May 20, 1960, Lee and his brother-in-law went to the speedway. Both were members of Atlantic in 1959 and 1960. Lee and his brother-in-law joined a line of persons who were entering through the pit gate. At the gate were a "no trespassing" sign and other indicia that only authorized persons could enter. As they approached the entrance gate they stopped at a table where two or three attendants were sitting or standing. On the table were some sheets of paper, each of which contained the following wording:

"RELEASE SHEET

"TRACK    Westboro                    DATE    May 20/60
LIABILITY: The entrant in signing this release elects to use said track at his own risk and thereby releases and discharges the track owners, the Promoter, the Atlantic Auto Racing, Ass'n., Inc., it's Officers and successors, agents and employees from all liabilities that may be accrued from personal injuries that may be received by said entrant, from all claims and demands for damages to personal property and employee growing out of or resulting from this race meet. The undersigned hereby acknowledges and represents that he is of sound mind and over 21 years of age.

"The entrant will also be aware of the fact that the promoter, track owners and the Atlantic Auto Racing Ass'n., Inc., its officers or their successors will not be liable for any state taxes, Government Taxes or legal fees. The entrant will also be aware of the fact that he is an independent contractor and he, and he alone, is liable for the above mentioned Taxes and Legal Fees. The hospital fund must be paid upon signing of this release. Fee is $1.00 per person and only four persons allowed to a car."

Below this wording the sheets were divided into eight sections or blocks, each with four lines for, respectively, the car number, and the names of the "driver," "owner" and "mechanic." When Lee reached the table he signed his name on the driver line in one of the blocks on the release sheet, and filled out and signed an application for membership in Atlantic for 1960 listing his classification as "mechanic," his car number as two, and the make of his car as "Ford."

The fees for membership in Atlantic ranged from $2 for a mechanic to $10 for an owner-driver. Lee was never the owner, driver or mechanic of any of the racing cars. He was never informed of the requirements for membership in Atlantic; "[h]e was not told whether he had to be an owner or mechanic of anything to join." The auditor found that there was no requirement for membership in Atlantic other than the payment of dues. Lee did not read

the release sheet. He was not, however, deprived of the opportunity to read it before he signed. There was no duress involved and no one made any representation to Lee as to what he was signing.

After signing and paying the membership fee and $1 for the hospital fund, Lee was given a ticket and his hand was stamped. The ticket and the stamp on his hand enabled him to go either to the pit or to the grandstand. If he had not been a member of Atlantic he would have been obliged to use a different entrance, required to pay $1.50 for each admission, and permitted to go only to the grandstand. Lee chose to go to the pit where he stood on the southeast side of the track by curve number three.

The pit area is lower than the area around the fence but it is high enough so that if one stands up by the fence one can see the races. Both Lee and his brother-in-law stood as close as they could get with their hands through the fence.

Lee was aware that wheels frequently came off cars at turn three. He had seen it happen during his "seven or eight" visits to the track in 1959. He had never seen a wheel go over the fence nor had he been told of one doing so. He had seen wheels hit the barricade of railroad ties and roll back into the infield. Lee was aware that at turn three the cars were going fastest, and that the greatest strain on the cars was on the steering mechanism of the front wheels at the turns.

There were no notices in the vicinity of the pit to warn people of the possibility of a wheel coming over the fence. Occasionally a man designated as the pit steward would make a request that people in the pit area stay away from the fence but the request was not enforced. Allied was aware that a wheel would jump the fence about six times a year and that this was most likely to happen at the third turn.

On the evening of May 20, during a class B race (for junk cars or jalopies), a wheel came off one of the cars at turn three. It went into the air and struck the top of the

fence.  Lee stepped back a foot or two and then the wheel struck him on the left shoulder.  After the accident Lee received checks covering his hospital bills up to a "certain amount" as a result of his membership in Atlantic.

Allied contends that the refusal to direct a verdict in its favor was error for the reason, among others, that the release barred Lee's claim as matter of law.  Lee, on the other hand, argues that Allied had the obligation to make him aware, before he was exposed to the risk, of any limitations upon liability which Allied proposed to assert.

In the so called "baggage check" or "ticket" cases wherein a defendant relies upon provisions on the stub limiting or excluding liability, we have held that it is a question of fact whether the patron was aware of the limitation of liability and that the burden is upon the defendant to show that the patron was made aware of the limitation. *O'Brien v. Freeman,* 299 Mass. 20.  *Sandler v. Commonwealth Station Co.* 307 Mass. 470.  *Kergald v. Armstrong Transfer Exp. Co.* 330 Mass. 254, 255–256, and cases cited. Lee asserts that the same principle applies to the case before us.  He contends that the signing of the release, in view of the fact that he did not read it, gave him no more notice of its terms than does the act of receiving and retaining a ticket containing exculpatory language.  He asks us to conclude that actual notice of the limitation of liability is required and that it was a question of fact properly submitted to the jury whether he had such notice.  We think, however, that the case rests on other grounds.

Lee has cited no case, and we are aware of none, factually similar to the present one in which the rule for which he argues has been applied.  As we have stated in one of the "baggage check" cases, where "what is received is apparently a means of identification of the property bailed, rather than a complete contract, the bailor is not bound by a limitation upon the liability of the bailee unless it is actually known to the bailor." *Kergald v. Armstrong Transfer Exp. Co.* 330 Mass. 254, 255–256.  In the "ticket" cases the rationale is also that the type of document which

Lee *v.* Allied Sports Associates, Inc.

the patron receives and the circumstances under which he receives it are not such that a person of ordinary intelligence would assume that the ticket limits the proprietor's liability unless the patron becomes actually aware of that limitation. *Kushner* v. *McGinnis,* 289 Mass. 326, 331. *Brennan* v. *Ocean View Amusement Co.* 289 Mass. 587, 594.

We think the signing of the paper to gain the right of admission in the case before us presents a different situation. On the facts of the case Lee cannot fail to have been aware that there was printing at the top of the sheet he signed. There is no evidence and no contention that the printing on the release sheet was covered or otherwise concealed from him. Although the line of people at the table on which the release sheets were located was "rolling along," there was no evidence that Lee was denied the opportunity to read the release had he so desired. "Nobody forced him to sign it." If he had wanted to know the significance of the printing on the paper which he signed, he could have read it. We think that, having failed to avail himself of that opportunity, yet gaining the admission to which his signature was a condition precedent, he cannot now complain that he had no notice of the import of the paper which he signed.

In this Commonwealth a right which has not yet arisen may be made the subject of a covenant not to sue or may be released. *MacFarlane's Case,* 330 Mass. 573, 576, and cases cited. Further "[t]here is no rule of general application that a person cannot contract for exemption from liability for his own negligence and that of his agents and servants." *Clarke* v. *Ames,* 267 Mass. 44, 47. Thus Allied could validly exempt itself from liability which it might subsequently incur as a result of its own negligence. *Ortolano* v. *U-Dryvit Auto Rental Co. Inc.* 296 Mass. 439. *Barrett* v. *Conragan,* 302 Mass. 33. *Schell* v. *Ford Motor Co.* 270 F. 2d 384, 386 (1st Cir.).

The failure of Lee to read the release before signing does not affect its validity. It is the rule in this Commonwealth that the failure to read or to understand the contents of a

release, in the absence of fraud or duress, does not avoid its effects. *Squires* v. *Amherst,* 145 Mass. 192, 194. *Rosenberg* v. *Doe,* 146 Mass. 191, 193. *McNamara* v. *Boston Elev. Ry.* 197 Mass. 383, 385–386. *Shaw* v. *Victoria Coach Line, Inc.* 314 Mass. 262, 266.

The question whether there is fraud in obtaining a release is generally one of fact. *Barrett* v. *Conragan,* 302 Mass. 33, 35. But Lee here testified that nobody made any representations to him as to what he was signing. In the absence of any concealment of or false representations as to the contents of the release it could be ruled as matter of law that the release was not procured by fraud. See *Freedley* v. *French,* 154 Mass. 339; *Barrett* v. *Conragan,* 302 Mass. 33; *Shaw* v. *Victoria Coach Line, Inc.* 314 Mass. 262. We so rule. We conclude that the paper which Lee signed as matter of law effectively released the defendant from liability for ordinary negligence to signatories who were within its terms.

Lee also argues that the release is not effective to bind him, even though he signed it, for the reason that the release was only to cover an "entrant." He asserts that the word "entrant" refers only to those who actively competed in the races and therefore he, not being an owner, driver or mechanic, is not within the terms of the release. Assuming, without deciding, that the word "entrant" refers exclusively to competitors rather than to all who enter through the pit gate, we think that the argument may not be maintained.

Lee in his application for membership in Atlantic, which membership was a prerequisite to entry into the pit, represented himself as a mechanic. Similarly, on the same evening, he signed the line marked "driver" to gain entry to the pit area. Although the auditor has found that "there was no other requirement than to pay . . . [the membership fee] in order to be a member of Atlantic," it was required both to gain membership in Atlantic and to obtain entry to the pit area that a person represent himself as owner, driver or mechanic. Atlantic apparently did not question

the representation made either for membership or admission by an applicant; rather it accepted the applications as made. Lee in each application represented himself as having duties which would bring him within the class of "entrants" in the sense of competitors. We think that in view of all the circumstances Lee may not now claim that the word "entrant" should be construed in its narrow and literal sense in order to put him outside of the class of "entrants." There is no question here of Lee being misled by the use of the word "entrant," since he did not read the release before signing.

Without any intimation that the contention has merit, we decline to consider the issue, raised by Lee for the first time before us, to the effect that Allied under the release is a third party beneficiary and therefore cannot interpose the release as a defence. See *Santa Maria* v. *Trotto,* 297 Mass. 442, 447; *Dalton* v. *Post Publishing Co.* 328 Mass. 595, 598–599.

We conclude that Lee was within the terms of the release which he signed. Since the release was otherwise effective as matter of law to bind him, the denial of defendant's motion for a directed verdict was error. We need not discuss other alleged errors.

*Exceptions sustained.*
*Judgment for the defendant.*