Tricia Cahalane sustained injuries while skydiving at the Chatham airport. She brought this action in Superior Court seeking damages for her injuries against Skydive Cape Cod (SCC); its owner, Jimmy Mendonca; her skydiving instructor, Marcus Silva; the Chatham Municipal Airport (airport) management company, Cape Cod Flying Circus, Inc. (Flying Circus); and Flying Circus's owner and the airport manager, Timothy Howard. Her amended complaint alleged theories of gross negligence, misrepresentation, deceit, and strict liability. She now appeals from a Superior Court judgment granting the defendants' motions for summary judgment. Cahalane contends that: (1) the waiver she executed before skydiving is unenforceable; and (2) there is a dispute of material fact as to whether the defendants were grossly negligent. We agree that the waiver is enforceable and would bar all claims for negligence, but reverse the allowance of the motions for summary judgment as to the claims of gross negligence.[2]
Background. We summarize the evidence in the summary judgment record in the light most favorable to the plaintiff, see Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991), noting disputes as warranted.
1. The release. On July 25, 2012, Cahalane participated in a tandem skydiving jump in Chatham. Before the jump, Cahalane signed several documents (collectively, the waiver) that relinquished her right to bring any legal action against the defendants in the event of an injury resulting from their negligence or gross negligence. The waiver, signed or initialed by Cahalane in forty-six places, provided in pertinent part:
"I UNDERSTAND THE RISKS AND DANGERS INVOLVED TO MY PHYSICAL PERSON. I HAVE BEEN ADEQUATELY INFORMED ABOUT THESE DANGERS AND RISKS AND I AM SUFFICIENTLY INFORMED TO SIGN AGREEMENTS WITH WHICH I WILLINGLY GIVE UP IMPORTANT LEGAL RIGHTS.
"...
"I hereby recognize that this agreement is a Contract, which includes provisions by which I have released any and all claims against the Released Parties resulting from my parachuting and related activities, included [sic] any claims caused by the negligence or gross negligence of the Released Parties.
"...
"I know and fully appreciate that parachute jumping activities expose me to the risk of personal injury and even death. I fully appreciate the dangers and voluntarily, expressly, assume these risks.
"...
"It is my understanding and intent that this Agreement, Release of Liability & Assumption of Risk, specifically include the following as those parties whom I fully release from all liability: (A) Skydive Cape Cod, Inc. (a Massachusetts Corporation, and associated entities), ... Cape Cod Flying Circus, Inc. ..., and their or its officers, directors, shareholders, agents, representatives, servants, employees, volunteers, pilots, instructors, contractors, jump masters, owners of aircraft, and associated entities....
"...
"I agree that if any portion of this Agreement, Release of Liability & Assumption of Risk is found to be unenforceable or against public policy, that only that portion shall be deleted, but I HEREBY SPECIFICALLY WAIVE any unenforceability or any public argument that I may make...."
In addition, Cahalane hand copied and signed the following statement: "I realize that skydiving, parachuting, flying and all of its related activities are inherently dangerous activities which may result in my serious injury or even death." The waiver stated that its terms were to be "broadly and liberally construed" in favor of the defendants with "all ambiguities" interpreted in their favor. Cahalane was given the opportunity to purchase a release from the waiver for $750, but did not.
2. The jump. During the jump, Cahalane was attached to her instructor, Silva. As is discussed more fully below, both the wind conditions and the execution of the jump are at issue. Viewed in the light most favorable to the plaintiff, as the pair approached the ground, in windy conditions, Silva performed a low "hook turn." Hook turns greater than ninety degrees and made less than 500 feet above ground level were one of the biggest causes of serious injury and death in skydiving. Such turns were expressly disapproved in safety bulletins issued in 2011 by the United States Parachute Association (USPA), a membership association. Cahalane was instructed to lift her legs into a seated position before landing. Cahalane originally had her legs in the seated position, but moments before landing she felt a pull from the back of the parachute that forced her legs straight downward. Cahalane fractured both femurs on impact.
The defendants contend that the admissible evidence in the summary judgment record demonstrates that "[t]here is no evidence ... of failure to make the jump as safe as possible," either as to weather conditions or jump protocols. Mendonca, SCC's owner, testified at deposition that he considered the wind conditions in determining whether it was safe to jump. In his estimation, wind speeds below twenty-five miles per hour were safe for skydiving. Mendonca checked the wind speed before Cahalane's jump and determined that it was within limits to jump safely. Cahalane testified that it was "very windy" and that "the wind was blowing hard." Silva believed that the wind could have caused Cahalane's legs to move downward. The Federal Aviation Administration (FAA) reported that wind conditions were "very gusty with peak gusts up to 26 knots" (29.9 miles per hour) on the day of the accident.[3] There are facts in dispute as to the wind speed, and so for purposes of summary judgment, we must assume that the wind speed exceeded twenty-five miles per hour that day.
Christopher Siderwicz, the airport manager at Cape Cod Airfield in Marstons Mills, gave an affidavit stating that, after the accident, Silva told him that "prior to his jump with Ms. Cahalane, [Silva] told Jimmy Mendonca that it was too windy to operate that day.... Jimmy ignored [Silva's] warning and ordered [him] to complete the jump and do a hook turn on landing to make up for the wind."[4] ,[5] Silva claimed that he had never done a hook turn with a tandem passenger, but he also described it as a maneuver used to land in strong winds.[6] Mendonca testified at his deposition that Silva made a "regular approach" with Cahalane, but made a ninety degree turn prior to landing. Two experts[7] concluded, based on a review of the jump photographs, that Silva had performed the type of low hook turn disapproved by the USPA resulting in the injuries to the plaintiff. There is a dispute of material fact as to whether Silva performed a low hook turn, and therefore, for purposes of summary judgment, we must assume that a hook turn was performed.
Months before the accident, Siderwicz informed Howard, the airport manager in Chatham,[8] that he had revoked SCC's right to operate at Cape Cod Airfield because he was concerned that Mendonca was not operating SCC in a "safe manner." Siderwicz told Howard that Mendonca "was operating when it was too windy, too foggy and too cloudy." Howard testified at deposition that it was his "job mainly to observe and report and pass on information to the airport commission for decisions." Howard further testified that he had a duty to inform the Chatham airport commission (commission) if there were violations of FAA standards at his airport.[9]
With respect to the conversation with Siderwicz, however, Howard stated that he "[did] not remember the specifics of" his conversation with Siderwicz, but "just remember[ed] [his] impression of the phone call." Howard stated, "I did relate to [the commission chair] that a phone call was placed from Chris Siderwicz to myself letting [me] know [SCC] weren't allowed to operate any more at the Marstons Mills airport, and that's it." Howard believed that SCC's right to operate at Cape Cod Airfield was revoked because of a personality conflict between Siderwicz and Mendonca. He denied knowing that Siderwicz had revoked SCC's license due to safety concerns, and made no report to the commission. When he did learn of Siderwicz's safety concerns, he did not look into them or notify the commission because he believed them to be unfounded.
There is a dispute of material fact as to what Siderwicz told Howard, and what Howard told the commission. Because there are facts in dispute, for purposes of summary judgment, Howard did not convey the safety concerns articulated by Siderwicz to him to the commission or the FAA.
Discussion. 1. Standard of review. "We review a grant of summary judgment de novo." Deutsche Bank Natl. Trust Co. v. Fitchburg Capital, LLC, 471 Mass. 248, 252-253 (2015). On appeal, the issue is "whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law." Molina v. State Garden, Inc., 88 Mass. App. Ct. 173, 177 (2015), quoting from Augat, Inc., 410 Mass. at 129.
2. Validity of the waiver. Cahalane challenges the enforceability of the waiver she signed prior to the jump. Massachusetts law favors the enforcement of releases immunizing parties from future liability for their negligent acts. See Cormier v. Central Mass. Chapter of the Natl. Safety Council, 416 Mass. 286, 287-290 (1993) ; Sharon v. Newton, 437 Mass. 99, 105 (2002). This includes cases that involve sports and recreation. See Lee v. Allied Sports Assocs., Inc., 349 Mass. 544, 550, 552 (1965) (spectator at pit area of speedway); Cormier, supra (beginner rider in motorcycle safety class); Sharon, supra (student at cheerleading practice). Challenges to waiver releases from liability have regularly been resolved by summary judgment. See, e.g., Cormier, supra at 287; Sharon, supra at 103; Gonsalves v. Commonwealth, 27 Mass. App. Ct. 606, 606 (1989).[10]
Cahalane signed or initialed the waiver in forty-six locations. Generally, "doubts about the interpretation of the [waiver] must be resolved in the plaintiff's favor." See Cormier, supra at 288-289. This particular waiver, however, was clear, "unambiguous and comprehensive." See id. at 288.
Nonetheless, Cahalane claims that the waiver was procured by fraud and is therefore unenforceable. "The question whether there is fraud in obtaining a release is generally one of fact." Lee, supra at 551. However, Cahalane does not assert that anyone made a false representation to her regarding the waiver. She contends that she relied on SCC's Internet postings that claimed SCC had the "best" safety record. Leaving aside the admissibility of the Internet postings on the current record, "[i]n the absence of any concealment of or false representations as to the contents of the release it could be ruled as matter of law that the release was not procured by fraud." Ibid. See Cormier, supra at 288-289.
Requiring Cahalane to sign the release or forgo her fifty dollar deposit does not render the waiver unconscionable. See ibr.US_Case_Law.Schema.Case_Body:v1">id. at 289. Cahalane knew that skydiving was a dangerous activity. The evidence does not suggest that Cahalane was rushed into signing the waiver. In these circumstances, where Cahalane was given the opportunity to read and sign the waiver, and also afforded a meaningful choice whether to proceed with the jump, we cannot conclude that enforcing it would be unconscionable. See Machado v. System4 LLC, 471 Mass. 204, 218 (2015).
We also reject Cahalane's contention that the waiver was invalid as against public policy. "An agreement, like the one before us, placing the risk of negligently caused injury on a person as a condition of that person's voluntary choice to engage in a potentially dangerous activity ordinarily contravenes no public policy of the Commonwealth." Cormier, supra at 289.[11]
3. Gross negligence, reckless and intentional conduct. Although a party may exempt itself from liability caused by its ordinary negligence, a waiver cannot shield a party from responsibility for its gross negligence or reckless or intentional conduct. See Sharon, 437 Mass. at 110-111 & n.12, citing Zavras v. Capeway Rovers Motorcycle Club, Inc., 44 Mass. App. Ct. 17, 18-19 (1997). Cf. Rafferty v. Merck & Co., 479 Mass. 141, 156 (2018) ("Implicit in both our common and statutory law ... is a long-standing public policy that, although we may be willing in certain circumstances to excuse ordinary negligence, we will not tolerate the reckless disregard of the safety of others"). We conclude that the judge erred in entering summary judgment for the defendants on Cahalane's claims of intentional, wilful, and grossly negligent conduct.
A claim of gross negligence requires "an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care." Zavras, supra at 20 n.4, quoting from Altman v. Aronson, 231 Mass. 588, 591-592 (1919). "Gross negligence is substantially and appreciably higher in magnitude than ordinary negligence.... It is very great negligence, or the absence of slight diligence, or the want of even scant care.... Gross negligence is a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence." Williamson-Green v. Equipment 4 Rent, Inc., 89 Mass. App. Ct. 153, 157 (2016), quoting from Aleo v. SLB Toys USA, Inc., 466 Mass. 398, 410 (2013). "Each [gross negligence] case must be decided upon its own peculiar facts," id. at 162 (quotation omitted), "and the defendant's conduct must be considered as a whole having due regard for the attendant circumstances." Rosario v. Vasconcellos, 330 Mass. 170, 172 (1953). Momentary inattention in a situation of "great and immediate danger" may constitute gross negligence. Zavras, supra at 22.
a. Silva and SCC. In an attempt to establish that Silva's hook turn was reckless or grossly negligent, Cahalane contends that hook turns were "prohibited" by the USPA at the time of the incident. The USPA is not a regulator, and the evidence did not show that the hook turn was "prohibited" in that sense, but the evidence did tend to show that the hook turn was highly disfavored by the USPA, upon whose standards the FAA relied.[12] Any lack of compliance with the USPA jump protocol would be relevant to the extent of Silva's negligence. See Hoffman v. Houghton Chem. Corp., 434 Mass. 624, 639 (2001). Cahalane's expert witness stated that hook turns were especially dangerous in the context of tandem jumps. A reasonable jury could find that Silva's decision to perform a hook turn in the moments before landing was grossly negligent -- regardless of whether the hook turn was the subject of a specific FAA regulation at the time of Cahalane's accident -- if the jury were to conclude that the low hook turn violated an industry standard and Silva had a lapse of care in a situation of "great and immediate danger." See Zavras, supra at 22. Assuming for purposes of summary judgment that a hook turn was performed, whether a hook turn was grossly negligent under the circumstances should have been left to the jury. See Sylvia v. New York, N.H. & H.R.R., 296 Mass. 157, 162 (1936).
b. Mendonca. Similarly, there is a dispute of material fact as to whether Mendonca's actions were reckless or constituted gross negligence. Siderwicz stated that Silva told him that Silva had concerns about the wind on the day of the accident, but that Mendonca "ordered [Silva] to complete the jump and do a hook turn on landing to make up for the wind." Mendonca claims that the weather was not an issue on the day of the accident and that it was ultimately the instructor who decided whether it was safe to jump. A jury could find that Mendonca ordered Silva to jump and that the decision to proceed -- in less than ideal weather conditions -- was "an act or omission respecting legal duty of an aggravated character...." See Zavras, 44 Mass. App. Ct. at 20 n.4.
c. Flying Circus and Howard. Flying Circus and Howard maintain that the FAA regulates skydiving operations, see 14 C.F.R. § 105 et seq., and that Howard did not have the authority or the duty to set standards that deviated from the FAA standards or to enforce those standards.[13] However, Howard admittedly had a duty to report any violations of FAA standards to, at the very least, the commission. The airport management agreement also required Howard to "attend [the] airport commission meetings and present a written report of the activities at the Airport for the previous month." If Siderwicz is credited, he put Howard on notice that Mendonca operated in dangerous and unsafe conditions, but Howard failed to pass that information on to the authorities that could take action.
A jury should be permitted to determine whether Howard's failure to report information pertaining to SCC and Mendonca to the commission and the FAA was reckless or grossly negligent. A reasonable jury could find -- given the dangerousness of the sport of skydiving -- that Howard was grossly negligent when he failed to report to the commission or the FAA that Siderwicz claimed Mendonca operated SCC in a dangerous manner. In the absence of such a report, the FAA was deprived of the ability to investigate those claims and take appropriate action in a timely manner. See Williamson-Green, 89 Mass. App. Ct. at 163 ("[A]cts or omissions may be evidence that warrants a finding of gross negligence if circumstances are such that they would lead to reasonable apprehension that [the tortfeasor's negligence in those circumstances] would lead to death or serious injury" [quotation omitted] ). See also Renaud v. New York, N.H. & H.R.R. Co., 206 Mass. 557, 560 (1910) ("When the injury likely to ensue from failure to do that which ought to be done is a fatal or a very serious one, what otherwise would be a lack of ordinary care may be found to be gross negligence").
Conclusion. The corrected judgment entered on March 9, 2017, is reversed as to counts I-V of the first amended complaint and as to the counterclaims for indemnification.[14] The judgment is affirmed as to counts VI-XV of the first amended complaint.
So ordered.
Reversed in part; affirmed in part.

Final judgment under Mass.R.Civ.P. 54(b), 365 Mass. 820 (1974), was entered for the defendants on the plaintiff's claims and for the defendants "for [the plaintiff's] liability" on their counterclaims for indemnification. The defendants' motions for attorney's fees and costs and entry of final judgment were denied without prejudice. The case comes before us on cross appeals.

SCC and Mendonca claim that the FAA report referenced in the appendix is inadmissible hearsay and cannot be considered. We express no opinion as to its admissibility at trial. However, because our review is de novo, "the record compiled for summary judgment is open to our independent consideration." Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 123 n.1 (1997). Flying Circus and Howard reference the FAA report in their brief to support the contention that Cahalane "may have inadvertently extended her legs which resulted in her breaking her legs." Accordingly, we consider the report. See Boston v. Roxbury Action Program, Inc., 68 Mass. App. Ct. 468, 469 n.3 (2007) (considering arguably inadmissible evidence on summary judgment where both parties have relied on it).

The judge did not consider the Siderwicz affidavit because "consideration of [it] would be unfair to [the defendants]." The docket does not show that a motion to compel or strike was filed, and the judge did not strike the affidavit. Based on a request in a reply brief, the judge in effect imposed the severest form of discovery sanction, without a motion, resulting in the dismissal of the case. The record is open to our independent consideration. See Matthews, supra. Even if a motion to compel had been properly filed and allowed, it would have been an abuse of discretion to decline to consider less significant sanctions before entering a sanction that effectively terminates the litigation on the merits. See Grassi Design Group, Inc. v. Bank of America, 74 Mass. App. Ct. 456, 460-461 (2009). For these reasons, we consider the affidavit for purposes of summary judgment.

Mendonca and Silva testified that it was ultimately the instructor's decision whether it was safe to jump.

Gustave Roque was an instructor and former employee of SCC who was, along with another customer, trailing Silva and Cahalane during their descent. Roque's affidavit states that he too witnessed Silva perform a hook turn when Cahalane was very close to the ground, a turn which, in his estimation, was a maneuver that could cause serious injury or death. In a subsequent deposition, Roque did not make the same representations. SCC and Mendonca contend that we should not consider the Roque affidavit because he is deceased, relying on Anselmo v. Reback, 400 Mass. 865 (1987). Both Siderwicz's affidavit and the expert testimony place the facts in dispute regarding the hook turn; we need not address or consider the Roque affidavit.

Derek Vanboeschoten is a USPA instructor and safety and training advisor who has performed more than 5,000 skydives. Dr. Richard Ziernicki is an engineer and accident reconstruction specialist.

In accordance with G. L. c. 90, § 51E, Chatham had appointed an airport commission to have the "custody, care and management" of Chatham Municipal Airport. Pursuant to the statute, the commission appointed an airport manager, who is "responsible to [the] commission for the proper maintenance and operation of [the] airport and of all facilities under his supervision."

Under the airport management agreement, Howard was required to implement "[a]ll minimum requirements of the [FAA]...." In addition, Howard was to "attend [the] airport commission meetings and present a written report of the activities at the Airport for the previous month. Such report shall include any matter that has or might cause a legal and/or operation problem involving the Airport...."

In her first amended complaint Cahalane dropped the negligence claims and pleads only gross negligence, strict liability, and deceit. We exercise our discretion to resolve the validity of the release because the question has been fully briefed and argued, and could recur on remand. Cahalane has not addressed, either in the lower court or on appeal, whether the release governs her strict liability claims. Cf. Sharon, 437 Mass. at 110-111 & n.12, citing Zavras v. Capeway Rovers Motorcycle Club, Inc., 44 Mass. App. Ct. 17, 18-19 (1997). Nor has she addressed the strict liability claims on the merits. In addition, although she alleges deceit based intentional, reckless, or grossly negligent misrepresentations, she has not briefed those counts of the complaint on appeal, limiting herself instead to a claim that she was fraudulently induced to sign the release by the defendants' misrepresentations. Accordingly, any arguments regarding the dismissal of counts VI-XV of the first amended complaint alleging strict liability and deceit are waived. See Zoning Bd. of Appeals of Lunenburg v. Housing Appeals Comm., 464 Mass. 38, 55 (2013) (arguments not made on appeal are waived).

Cahalane's contention that the waiver she signed was applicable only to the Cape Cod airfield in Barnstable, not SCC in Chatham, is waived as it was not raised at the summary judgment proceeding. See Matter of Steinberg, 448 Mass. 1024, 1025 (2007).

The USPA published in its magazine a set of recommended rules for parachute jumps in an article, prepared by three parachute manufacturers, entitled "19 Commandments of Tandem Parachute Operation." The expert authenticated the article and relied upon "Commandment 11," which states in pertinent part that there are to be "no hook turns (no turns greater than 90 degrees under 500 feet AGL [above ground level] )," and on "Commandment 12," which states that the canopy should be level by 100 feet AGL without exception. Although the FAA claimed in correspondence with the town of Chatham that the FAA and the FAA alone was entitled to monitor and enforce its standards, it relies upon and incorporates USPA standards in its review, and has noted that they are considered "industry best practices." See FAA Advisory Circular No. 155-2D.

See note 11, supra, and the Federal Aviation Act of 1958, 49 U.S.C. § 1301 et seq. ; Burbank v. Lockheed Air Terminal, 411 U.S. 624, 626-627 (1973) ; Blue Sky Entertainment, Inc. v. Gardiner, 711 F. Supp. 678, 683 (N.D.N.Y. 1989) ; Skydiving Ctr. of Greater Washington, D.C., Inc. v. St. Mary's County Airport Commn., 823 F. Supp. 1273, 1283-1284 (D. Md. 1993) ; McWilliams v. S.E., Inc., 581 F. Supp. 2d 885, 889 (N.D. Ohio 2008).

In view of our decision, we do not reach the issue raised by the cross appeal by three defendants concerning the propriety of the judge's order requiring a jury trial on the issue of attorney's fees.