NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-489

JEREMY PARADISE

vs.

JOHN POMERANCE & others.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff, Jeremy Paradise, appeals from a Superior Court judgment dismissing his six-count complaint against the defendant attorneys and their law firm, based on their role in establishing a trust for which he was the grantor.  Jeremy alleged that although he intended to have ultimate control of the trust, the defendants caused the trust instrument to be changed to give control to his brother, Andrew Paradise, and that Jeremy signed the final draft of that document without knowing of the change.[2]

---

[1] Kurt Steinkrauss, Alison Glover, Michael Gardener, and Mintz, Levin, Cohn, Ferris, Glovsky, & Popeo, P.C.

[2] To avoid confusion, we refer to the brothers by their first names.  No disrespect is intended.

On cross-motions for summary judgment, a judge ruled that, even accepting arguendo Jeremy's position that the defendants represented him, Jeremy's claims failed. She concluded that Jeremy could not establish the reasonable reliance on an alleged misrepresentation by the defendants that was necessary to Jeremy's first three claims (fraudulent inducement, and intentional and negligent misrepresentation). She further concluded that he could not establish the causation element necessary to all six of his claims (the above three plus violations of G. L. c. 93A, malpractice, and breach of fiduciary duty). We affirm the dismissal of the first three claims but, concluding that genuine issues of material fact remain as to the latter three, we vacate their dismissal and remand for further proceedings.

Background. We recite the undisputed facts necessary to an understanding of the issues before us; where matters are disputed, we refer to them as a party's assertions rather than as facts. In December 2018, the brothers reached an understanding to move some of Jeremy's shares of stock in Andrew's business (Skillz, Inc.) into a trust to benefit Jeremy's unborn son. The "key terms" included making Jeremy the "lead trustee," with authority to manage some parts of the trust, and making Andrew "the other trustee in charge of

2

managing it."  Andrew forwarded the e-mail message stating these terms to the defendant John Pomerance, an attorney at the defendant law firm Mintz, Levin, Cohn, Ferris, Glovsky, & Popeo, P.C. (Mintz).  Jeremy asserts that Pomerance and Mintz had performed legal work for him over the preceding five years. Pomerance in turn forwarded the message to another Mintz attorney, the defendant Kurt Steinkrauss.  Jeremy was copied on these messages.

Jeremy asserts that he understood he was setting up a trust that he would control, and that Mintz would represent him and act in his interests in doing so.  Andrew had privately told Pomerance, however, that he (Andrew) intended to control the trust.  Mintz and the other defendants assert that they represented only Andrew, and never Jeremy, in connection with establishing Jeremy's trust, as well as another trust for Andrew.[3]

Jeremy asserts that, in a February 2019 telephone call between himself, Steinkrauss, and Andrew, Steinkrauss advised that Jeremy could control his trust by appointing a colleague or

---

[3] Andrew asserted that he and Jeremy had a "deal," as a part of which Andrew would be in charge of Jeremy's trust, and would facilitate Jeremy obtaining $1 million from the sale of Skillz stock, if Jeremy agreed to put his Skillz stock in a trust controlled by Andrew.

3

friend to be the "trust protector," whom Jeremy could remove if that person was not acting as Jeremy wanted. Jeremy asserts that Steinkrauss advised that both Jeremy's and Andrew's trusts should be formed in Delaware and that the brothers should retain Delaware counsel for that purpose, but that Steinkrauss would "supervise everything." The brothers approached a Delaware law firm, Gordon, Fournaris & Mammarella, P.A. (GFM), and engaged GFM to draft both trusts. A GFM attorney sent Jeremy an outline stating, in part, that he typically drafted his trusts to give the grantor (here, Jeremy) the power to remove the trust protector.[4] Jeremy asserts that he read the outline. The GFM attorney also told Steinkrauss that Steinkrauss would be copied on all correspondence so that he could review it.

In March 2019, GFM sent the brothers and Steinkrauss the drafts of the trusts. The draft of Jeremy's trust gave Jeremy the authority to remove and replace the trust protector, with Andrew to have that authority if Jeremy were no longer living or competent. Hereafter we refer to this arrangement as putting Jeremy in "first position" and Andrew in "second position." Jeremy asserts that he read the draft but could not understand

---

[4] The outline explained that the trust protector typically was given the power, among others, to remove and replace the trustee, as well as any advisers on investment direction or on distribution.

it.  A few days later, Andrew spoke to Steinkrauss by telephone and asked that Mintz convey to GFM Andrew's instruction to put him, rather than Jeremy, in first position in Jeremy's trust.  The defendant attorney Alison Glover at Mintz conveyed a request for that change to GFM.

GFM made this and other changes and sent redlined and clean versions of the draft (as well as a new draft of Andrew's trust) back to Glover, who in turn sent them to the brothers and Steinkrauss.  A GFM attorney later testified that, at the time Glover requested the change and the changed drafts were sent, he did not believe anyone at GFM had discussed the change with Jeremy, but his understanding was that Mintz represented Jeremy and that Jeremy had approved the change.  The GFM attorney further testified that if he had known at the time of Mintz's position that it did not represent Jeremy, but that Mintz was communicating to Jeremy without GFM's knowledge, "very likely, I would have followed up directly with Jeremy regarding the changes."

The redlined change that put Andrew (identified as "[t]he Grantor's Brother") in first position and Jeremy (identified as "[t]he Grantor") in second position appeared on page thirty-five of the fifty-six-page draft.  We think it fair to say the change itself was clearly visible to a reasonable person looking at

5

that page, although understanding the significance of the change would require familiarity with other provisions of the trust. Glover's cover e-mail message to the brothers contained "[a] few questions" but did not ask about, mention, or otherwise call attention to the change putting Andrew in first position and Jeremy in second position. Jeremy asserts that he understood the message as summarizing all of the changes to his trust. Jeremy did not read the redlined or clean drafts.[5]

In April 2019, GFM sent the trust documents to Jeremy and Andrew for execution, copying Steinkrauss, Glover, and others on the cover message. Steinkrauss replied to GFM, copying Andrew and all other recipients except Jeremy, asking GFM to confirm that Andrew would have sole control of his trust and that Andrew and Jeremy would have "joint control" of Jeremy's trust. The parties dispute the reason for Steinkrauss's omitting Jeremy from this message; the defendants assert that he did so "because Mintz represented Andrew and not Jeremy."

GFM replied to Steinkrauss that in both trusts, Andrew alone had the authority to remove and replace the trust

---

[5] We do not overlook that Andrew sent Jeremy a text message asking if he had looked at the documents, to which Jeremy replied that he would "sign whenever you tell me they are ready" and that "I'm just going to trust your edits." This exchange, if relevant at all to Jeremy's claims against the defendants, is not fatal to them.

protector, and GFM asked to be notified if this should be changed. Steinkrauss replied: "Andrew is fine the way it is. They will sign today." Although Andrew was copied on those messages, Jeremy was not.

Steinkrauss and Pomerance arranged for Jeremy to sign the trust document at Mintz's offices, and Jeremy signed it without having read the final draft. Jeremy asserts that, at the time he signed it, he was unaware of the change putting Andrew in first position to remove the trust protector. He further asserts that he would neither have signed, nor have subsequently transferred over three million shares of stock into the trust, had he known "Mintz was not representing him or his interests."[6]

On the parties' cross motions for summary judgment, the judge accepted for purposes of the motion Jeremy's position that the defendants represented him during the establishment of his trust and that they violated their professional obligations to him. Even so, she ruled, Jeremy could not prove, for purposes of his misrepresentation-based claims (fraudulent inducement, and intentional and negligent misrepresentation), that his

---

[6] The trust is irrevocable. As of June 2021, it had a net asset value of over $35.9 million. Jeremy petitioned the Delaware Chancery Court for reformation of the trust, but, following a two-day trial, judgment entered for the respondents. In the present action, Jeremy's damages claim includes more than $5.3 million in legal fees he assertedly incurred in connection with the Delaware case.

7

reliance on any misrepresentations by the defendants was reasonable. Rather, she concluded, Jeremy alone was responsible for the consequences of his failure to read the drafts putting Andrew in first position. The judge further ruled that, for purposes of those three claims and his additional claims for violations of G. L. c. 93A, malpractice, and breach of fiduciary duty, Jeremy could not prove that the defendants' conduct was what caused him to sign the trust document without being aware that Andrew had been put in first position. From the resulting judgment of dismissal, Jeremy appealed.

Discussion. "The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991). We draw all reasonable inferences in favor of the nonmoving party. See Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 38 (2005). The defendants may also obtain summary judgment by demonstrating that Jeremy, who would have the burden of proof at trial, has no reasonable expectation of proving an essential element of his case. See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).

Importantly, for the purposes of this appeal only, the defendants assume (as did the judge) that they acted as Jeremy's attorneys, and they argue that Jeremy nevertheless cannot prevail.  We proceed on the same assumption, and we therefore need not discuss Jeremy's arguments that such an attorney-client relationship existed.  We turn directly to the grounds for the judge's ruling.

1.  Reasonable reliance.  Jeremy's first three claims have in common the element that a plaintiff's reliance on a defendant's allegedly false statement must have been reasonable.  This is true of Jeremy's claims for fraud in the inducement, see Commerce Bank & Trust Co. v. Hayeck, 46 Mass. App. Ct. 687, 692 (1999); intentional misrepresentation, see Masingill v. EMC Corp., 449 Mass. 532, 540 (2007); and negligent misrepresentation, see Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 59 (2004).[7]  Yet it is unreasonable to rely on alleged misrepresentations about the contents of a document if one had an opportunity to read the document and a cursory reading would have revealed its true content.  See Collins v. Huculak, 57 Mass. App. Ct. 387, 391-393 & n.7 (2003).  "One who

---

[7] The judge did not conclude, and the defendants do not assert on appeal, that such reasonable reliance is an element of Jeremy's other three claims (violation of chapter 93A, malpractice, and breach of fiduciary duty).

9

signs a writing that is designed to serve as a legal document
. . . is presumed to know its contents."  Hull v. Attleboro Sav.
Bank, 33 Mass. App. Ct. 18, 24 (1992).

Based on these principles, the judge ruled that Jeremy's
three misrepresentation-based claims failed because it was
unreasonable for him to have relied on any alleged
misrepresentations by the defendants that he was in first
position.  This was because the defendants had sent him a
redlined draft and later a clean execution copy that showed he
was not in first position, and that he had every opportunity to
read.  On appeal, Jeremy does not seriously dispute that,
putting aside whatever heightened duties the defendants may have
had to him as his (assumed) attorneys, his misrepresentation-
based claims are not viable.  Jeremy thus acknowledges that
"[t]he existence of an attorney-client relationship is . . .
critical" to his claims.

To be sure, Jeremy points out that, although a party's
failure to read or understand a document before signing it does
not free him from its obligations, this rule is subject to an
exception for fraud.  See Miller v. Cotter, 448 Mass. 671, 680
(2007); Sharon v. Newton, 437 Mass. 99, 103 (2002); Lee v.
Allied Sports Assocs., Inc., 349 Mass. 544, 550-551 (1965).  But
those decisions do not expand the concept of fraud to impose a

10

heightened duty to disclose the contents of a document to a party who is perfectly capable of reading it.  The decisions thus do not strengthen Jeremy's misrepresentation-based claims.[8] Any such heightened duty of disclosure must, at least on this record, be based on the defendants' having been Jeremy's attorneys or having led him to believe that they were.[9]

While Jeremy focuses on the defendants' asserted failure to sufficiently inform him of the trust terms, his brief also includes scattered assertions that the defendants failed to inform him that they did not represent him or misled him into thinking that they did.  Jeremy makes these assertions, however, primarily in support of his claims that an express or implied

---

[8] Nor do those decisions, or cases such as Commerce Bank & Trust Co., 46 Mass. App. Ct. at 463 (party bound by document he voluntarily signed without reading), assist the defendants. What Jeremy seeks here is not to be relieved of his obligations under the document he signed, but an award of damages against those he asserts caused him to sign the document in violation of their duties to him.

[9] Jeremy also cites decisions recognizing that, in special circumstances of reasonable reliance by insureds, heightened duties may be imposed on insurance brokers or agents.  See Campione v. Wilson, 422 Mass. 185, 195-196 (1996); Martinonis v. Utica Nat'l Ins. Group, 65 Mass. App. Ct. 418, 421 (2006).  But Jeremy cites no authority applying those cases outside of the insurance context, nor does he explain how any special circumstances here would create a heightened duty different from that created by an attorney-client relationship.  Because we conclude infra that Jeremy may pursue his malpractice claim, we need not discuss the special circumstances argument further. Moreover, it appears not to have been made to the judge.

11

attorney-client relationship existed and that the defendants breached their professional duties to him.  They might also be asserted under the rubric of his chapter 93A claim.  Because we conclude infra that Jeremy may pursue those claims, and because he does not explain what, if anything, the assertions add to his misrepresentation-based claims, we affirm the judge's ruling dismissing those latter claims (counts 1-3).

2.  Causation; duty.  The judge concluded that Jeremy's remaining claims failed because, as a matter of law, it was Jeremy's own failure to read the document before signing that caused his alleged injuries -- not the defendants' failure to do more to ensure that he knew the content of the document.  The judge relied primarily on a Federal court decision recognizing that, under New York law,

> "when the only allegation of legal malpractice is a failure
> to advise a plaintiff-client of the consequences of a
> contractual provision, without more, there is no
> malpractice liability where the agreement reveal[s] on its
> face what the client claim[s] he was not told because in
> such cases, the malpractice claim is flatly contradicted by
> documentary evidence" (quotations and citations omitted;
> emphasis added).

Preferred Fragrance, Inc. vs. Buchanan Ingersoll & Rooney PC, U.S. Dist. Ct., No. 15 CIV. 1293 BMC (E.D.N.Y. Oct. 18, 2015) (Preferred Fragrance).  In other words, where the clients claimed to have been "harmed by [their attorney's] failure to adequately explain a provision" of a document they were to sign,

12

yet "the provision spoke for itself," the attorney had no "cognizable duty to do more."  Id.  Although the judge here framed her conclusion as going to causation, Preferred Fragrance frames the issue as involving an attorney's duty, and that rubric is more helpful here.[10]

We need not decide whether Preferred Fragrance's statement of New York law is also the law of Massachusetts, because the court's description of the limits on an attorney's duty to ensure the client's understanding of a legal document contains a key qualifying phrase:  "without more."  Preferred Fragrance, supra.  Indeed, the court recognized that the result might be different if, for example, there was evidence the attorney "knew, or had reason to know, that [the client] would balk" at the particular provision at issue.[11]  Id.  There is such evidence here.

---

[10] The judge based her causation analysis on Hager vs. Vertrue, Inc., U.S. Dist. Ct., No. CIV.A. 09-11245-GAO (D. Mass. Sept. 28, 2011).  That decision, however, did not involve any claim against an attorney, nor did it discuss whether an attorney has a heightened duty to ensure a client's knowledge of a document despite the client's failure to read it.

[11] For the same reason, the defendants can draw no support from EVIP Canada, Inc. vs. Schnader Harrison Segal & Lewis LLP, U.S. Dist. Ct., No. 18-CV-11456 (LJL) (S.D.N.Y. Mar. 15, 2021). In that case, the plaintiff clients "did not advise [the defendant attorneys] at the outset of their need for" the particular provision at issue.  Id.

That evidence, some of it subject to genuine dispute, includes the following:[12]  (1) Steinkrauss knew from the initial e-mail messages that Jeremy wanted to have at least some control of his trust; (2) Andrew privately told Steinkrauss's colleague Pomerance that Andrew intended to control Jeremy's trust; (3) Steinkrauss told Jeremy he could control his trust by retaining the authority to remove and replace the trust protector; (4) Steinkrauss told Jeremy that Delaware counsel should draft the trust but that he (Steinkrauss) would supervise everything; (5) Jeremy could reasonably expect that GFM would draft the trust to give him authority over the trust protector, and GFM initially did so; (6) Andrew then asked Steinkrauss to convey to GFM that the trust should be changed to put Andrew rather than Jeremy in first position, and Steinkrauss through his colleague Glover conveyed this message to GFM, which made the change; (8) Glover sent Jeremy a fifty-six-page redlined draft, showing this particular change on page thirty-five, but did not otherwise call it to his attention, and Jeremy did not read the draft; (9) Steinkrauss intentionally removed Jeremy (but not Andrew) from an e-mail message chain seeking GFM's confirmation of who would control Jeremy's trust; (10) GFM

_____

[12] We pass over the evidence Jeremy cites as supporting his belief that the defendants had represented him in the past and represented him in connection with the formation of his trust.

14

replied that Andrew would do so and asked if that should be changed, to which Steinkrauss replied that Andrew was "fine" with having such control but said nothing about his (assumed) client Jeremy's position; (11) Steinkrauss and Pomerance arranged for Jeremy to sign the trust document at Mintz's office, which Jeremy did without reading the final draft; and (12) Jeremy would not have signed it or transferred over three million shares of stock into the trust had he known Mintz was not representing him.

Viewing this evidence in the light most favorable to Jeremy as the nonmoving party, and drawing all reasonable inferences in his favor, a jury could find that the defendants knew it was important to Jeremy to have control of his trust and that he was relying on them to assist him; they told him that he could have control and that they would supervise everything; but then they assisted in having the control shifted to Andrew, without affirmatively ensuring that Jeremy knew of and agreed to the change; and they took the affirmative step of cutting Jeremy out of the e-mail conversation in which they sought and received confirmation of their client Andrew's final role.

"The relation of attorney and client is highly fiduciary in its nature. . . . The attorney owes his client a duty of full and fair disclosure of facts material to the client's

15

interests." Hendrickson v. Sears, 365 Mass. 83, 90 (1974). See Blake v. Hendrickson, 40 Mass. App. Ct. 579, 582 (1996) (attorney is client's agent); Gagnon v. Coombs, 39 Mass. App. Ct. 144, 156 (1995) (agent has fiduciary duty to use reasonable efforts to give principal information which agent has notice principal would desire to have).

Again assuming arguendo that the defendants were Jeremy's attorneys, then, where they had reason to know that Jeremy wanted his trust drafted to give him control, and that he was relying on their skill as attorneys to help him achieve his objective, it is a question of fact whether they made reasonable efforts to do so, or to ensure he knew that the final draft did not achieve that objective before he signed it. An attorney's duty to a client may often include presenting the client with a document for signature that the attorney has participated in drafting, or reviewing, to ensure it serves the client's interests. When the attorney is on notice that a particular provision of the document is or may be contrary to the client's wishes or interests, we are unwilling to conclude as a matter of law that the attorney's duty is discharged by merely presenting the client with a lengthy redlined draft and leaving it to the client to read the document and ask about the redlined changes. That level of disclosure may suffice in an arm's-length

16

relationship between parties of comparable sophistication, but "[t]he attorney and client do not deal with each other at arm's length."  Berman v. Coakley, 243 Mass. 348, 354 (1923).  "Unflinching fidelity to their genuine interests is the duty of every attorney to [that attorney's] clients."  Id.

We decline to hold it unforeseeable as a matter of law that a client, rather than reading and understanding every page of every document the attorney presents for signature, might instead rely on the attorney to call attention to its important features.[13]  This element of foreseeability is why we do not adopt the judge's causation-based approach, or the defendants' causation argument on appeal.  "[P]roximate cause of an injury depends not on factual causation, but rather on whether the injury to the plaintiff was a foreseeable result of the defendant's negligent conduct."  Kent v. Commonwealth, 437 Mass. 312, 320 (2002).  "The definition or scope of proximate cause

---

[13] The defendants cite a decision assertedly holding that such reliance on an attorney is unreasonable as a matter of law for purposes of claims against the attorney.  See Smith v. Jenkins, 718 F. Supp. 2d 155, 163, 167 (D. Mass. 2010).  Smith holds no such thing.  Although certain defendants in that case successfully argued that the plaintiff could not avoid responsibility for knowing the contents of a document by arguing that she "trusted the lawyer," id. at 163, the defendants making that argument did not include the lawyer in question, and the claims dismissed on that ground were claims of fraud against others, not malpractice or breach of fiduciary duty claims against the lawyer.  See id. at 158 n.1, 160 & n.5, 166-167.

17

(or foreseeable result) is in turn based on considerations of policy and pragmatic judgment" (quotation and citation omitted). Id. We do not accept as the policy of this Commonwealth, or as a sound, pragmatic judgment, that attorneys can never foresee that their clients will not read documents carefully and, therefore, that an attorney's failure to expressly draw a client's attention to particular provisions affecting the client's expressed interests can never be a proximate cause of an injury that follows from the client's signing the document without reading it.[14]

To the extent that Jeremy also bore some responsibility for reading the documents, a finder of fact would ordinarily have to sort out the relative fault of the parties. "Comparative fault appropriately applies to a client's claim of malpractice by a lawyer." Clark v. Rowe, 428 Mass. 339, 345 (1998). The

---

[14] The defendants advance a separate causation argument: that even if Jeremy had known that Andrew was in first position, Jeremy would have signed the trust document. But this is a disputed fact, notwithstanding the defendants' argument that Jeremy "did not have any intent" regarding control of the trust and "would have signed anything put in front of him to receive $1,000,000 from Andrew," as Andrew asserted was their "deal" at the time. We acknowledge that the Delaware court (1) viewed as "counterfactual" Jeremy's assertion that controlling his trust was important to him, and (2) found "[t]he strongest inference [to be] that Jeremy had no clear intent" as to the trust protector issue at the time he signed the document. But the defendants conceded at oral argument before us that the Delaware court's determinations on those points are not entitled to issue preclusive effect in this litigation.

responsibility for the client's knowledge and understanding may be shared between the attorney and the client, to an extent that in some cases will present questions of fact.[15] If the defendants here were indeed Jeremy's attorneys, then this may be one of those cases.

Ruling as we do, we need not address the judge's alternative reasoning and the defendants' argument based on the asserted issue preclusive effect of three conclusions reached by the Delaware court. In brief, those conclusions, even if fatal to Jeremy's fraud theory, have no bearing on whether the defendants had, and violated, heightened duties to ensure Jeremy's knowledge of what he was signing.

We therefore vacate so much of the judgment as dismissed Jeremy's malpractice claim (count 5). As for the breach of fiduciary duty claim (count 6), the judge viewed it as duplicative of the malpractice claim, and dismissed it on the

---

[15] The defendants miss the point in arguing, on the comparative negligence issue, that "a client who doesn't read a document he signs is necessarily more negligent than a lawyer who doesn't remind the client of each provision in it before the client signs it." This case is not about the defendants' failure to remind Jeremy of "each provision" in the trust document. It is about (1) their failure to do more to ensure he knew of a particular provision that was important to him, and (2) their act of affirmatively removing him from an e-mail message chain that would have clarified to him -- as the defendants saw fit to do with their client Andrew -- exactly who would be in control of his trust.

19

same ground, lack of causation, that we have now concluded was error.  We therefore vacate the dismissal of the fiduciary duty claim, and we note that "[i]ntentional breaches of fiduciary duties" may stand "apart from a claim of malpractice."[16]  Clark, 428 Mass. at 345.  See G. Jacobs & K. Laurence, Professional Malpractice § 17.1 (2007) (explaining that legal malpractice and breach of fiduciary duty claims are not necessarily duplicative).  Whether comparative negligence is relevant in a fiduciary duty case, as it is in a legal malpractice case, was left unresolved in Clark, 428 Mass. at 345-346.  It has not been briefed here, and we express no view on it.

Finally, because the chapter 93A claim (count 4) was dismissed on the same causation ground as the malpractice and fiduciary duty claims, we vacate the dismissal of the chapter 93A claim as well.  Legal malpractice and breach of fiduciary duty may fall "within at least the penumbra of some common-law, statutory, or other established concept of unfairness," one that

---

[16] In Van Brode Group, Inc. v. Bowditch & Dewey, 36 Mass. App. Ct. 509 (1994), the court held that on the particular facts of that case, and where "instructions to the jury on the legal malpractice count in effect covered the subject matter of the fiduciary duty count, albeit in a slightly different analytical framework," the plaintiff "was not prejudiced by the striking of the fiduciary duty count." Id. at 516, 517.  The two counts could be viewed as essentially duplicative "on the evidence presented." Id. at 517 n.10.  The decision nowhere suggests that they are always duplicative.

20

"is immoral, unethical, oppressive, or unscrupulous," and would "cause[] substantial injury to consumers" (citation omitted).[17] PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975).

Conclusion. So much of the judgment as dismissed counts 4 (violation of G. L. c. 93A), 5 (malpractice), and 6 (breach of fiduciary duty) is vacated, and the case is remanded for further

---

[17] As for the malpractice claim, we note that "[a] negligent act standing by itself does not give rise to a claim under c. 93A. There must in addition be evidence that the negligence was or resulted in an unfair and deceptive act or practice." Squeri v. McCarrick, 32 Mass. App. Ct. 203, 207 (1992). See Meyer v. Wagner, 429 Mass. 410, 423-424 (1999) (judge properly rejected client's chapter 93A claim against attorney where client failed to prove conduct going beyond professional negligence and amounting to unfair or deceptive acts); Poly v. Moylan, 423 Mass. 141, 151 (1996), cert. denied sub nom. Poly v. Cargill, 519 U.S. 1114 (1997) (same). Here Jeremy asserts that the defendants lulled or misled him into thinking that they represented him, and took an affirmative step that made him less likely to discover that Andrew would be in control of his trust. There appear on this record to be genuine disputes of fact on these issues. The judge here agreed that "Mintz could and should have done a much better job clearly delineating the scope of its representation and whom it represented in connection with the formation of the trusts." That said, we do not attempt to delineate the precise scope of the chapter 93A claim that Jeremy may pursue on remand, as the issue has not been briefed on appeal.

proceedings on those claims.  The judgment is otherwise affirmed.

      <u>So ordered</u>.

      By the Court (Sacks,
        Hodgens & Toone, JJ.[18]),

      Clerk

Entered: April 10, 2026.

---

[18] The panelists are listed in order of seniority.